Todd G. Miller (SBN 163200), miller@fr.com
Michael A. Amon (SBN 226221), amon@fr.com
Craig E. Countryman (SBN 244601), countryman@fr.com
Fish & Richardson P.C.
12390 El Camino Real
San Diego, CA 92130
Phone: 858-678-5070/Fax: 858-678-5099

Frank E. Scherkenbach (SBN 142549), scherkenbach@fr.com
Fish & Richardson P.C.
225 Franklin Street
Boston, MA  02110-2804
Phone:  617-542-5070/Fax: 617-542-8906

Jonathan J. Lamberson (SBN 239107) lamberson@fr.com
Keeley I. Vega (SBN 259928), kvega@fr.com
Neil A. Warren (SBN 272770), warren@fr.com
Fish & Richardson P.C.
500 Arguello Street, Suite 500
Redwood City, CA 94063
Phone: 650-839-5070/Fax: 650-839-5071

Attorneys for Defendant/Counterclaimant NUVASIVE, INC.

UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| WARSAW ORTHOPEDIC, INC.; MEDTRONIC SOFAMOR DANEK U.S.A., INC.; MEDTRONIC PUERTO RICO OPERATIONS CO.; AND OSTEOTECH, INC.<br><br>Plaintiffs,<br><br>v.<br><br>NUVASIVE, INC.,<br><br>Defendant. | Case No. 3:12-cv-02738-CAB-MDD<br><br>**NUVASIVE'S OPPOSITION TO PLAINTIFFS' MOTION TO STAY**<br><br><br>Judge:      Hon. Cathy Ann Bencivengo<br>Courtroom:  4C<br>Date:       December 20, 2013<br>Time:       10:00 a.m. |
| NUVASIVE, INC.,<br><br>Counterclaimant,<br><br>v.<br><br>WARSAW ORTHOPEDIC, INC.; MEDTRONIC SOFAMOR DANEK U.S.A., INC.; MEDTRONIC PUERTO RICO OPERATIONS CO.; OSTEOTECH, INC., MEDTRONIC, INC.; and MEDTRONIC SOFAMOR DANEK DEGGENDORF, GMBH,<br><br>Counterclaim-Defendants. | |

# I.    INTRODUCTION

Plaintiffs' motion to stay litigation of all of NuVasive's asserted patents is a bald attempt to control and manipulate the Court's schedule for their own strategic objectives.  Despite the Court's past statements that it evaluates the merits of a motion to stay on a case-by-case basis, Plaintiffs now ask the Court to adopt a blanket rule that the mere filing of a petition for *inter partes* review—at any time and for any reason— requires an immediate stay of the relevant patents.  If the Court were to adopt such a rule, it would be ceding control of its docket to the parties, who could then strategically time the filing of the IPR requests with the knowledge that they could control the litigation schedule to suit their objectives.

Plaintiffs admit that this motion conflicts with the positions they took earlier in this case.  (Doc. No. 141-1 at 1.)  Plaintiffs attempt to justify the change in their position based on allegedly changed circumstances.  But there are no changed circumstances, and, regardless, the circumstances do not warrant the blanket rule Plaintiffs advocate.  First, the IPR grant statistics have not materially changed since the motions relating to the '997 and '696 patents.  Second, the *Fresenius* decision dealt with the narrow question of when a judgment is final and decided that issue based on precedent that is decades old.  It did not change the long-standing law regarding the interaction between final court judgments and PTO decisions invalidating patents.

Try as they may to justify their change in position, Plaintiffs' motion for stay is really another step in their calculated strategy in response to the PTO's institution of IPR proceedings against the '997 patent.  Plaintiffs had invalidity contentions prepared on all NuVasive's patents on June 6, 2013.  (Doc. No. 60 at ¶ 2.)  But it was only after the PTO granted IPR on the '997 patent in late September that Plaintiffs first stated that they intended to file IPRs against all of NuVasive's patents.  In contrast, NuVasive told the Court and Plaintiffs promptly and repeatedly that it would be filing IPR petitions.  Despite multiple opportunities in communications with the Court, Plaintiffs did not say a word about filing IPR or moving to stay.  Indeed, NuVasive asked

Plaintiffs in early September if they intended to file IPRs on NuVasive's 4 XLIF patents and design patent and got a non-answer. But, then, the institution of IPR on '997 changed the dynamics of the trial—Medtronic simply does not want to face the NuVasive patents without a Michelson patent in hand—forcing Plaintiffs to reverse course by filing IPRs on all NuVasive's patents and then moving to stay. Indeed, Plaintiffs filed IPR requests for NuVasive's '334 and '156 implant patents in August. But it was only in November, after filing IPR requests on NuVasive's other asserted patents, that Plaintiffs suddenly informed the Court of those filings and make what amounted to an oral request for stay of all patents on the eve of the *Markman* hearing.

Nothing has changed except Plaintiffs' strategy, and that strategy has imposed significant costs on the Court and NuVasive. The Court has already prepared for and conducted a day-long *Markman* hearing on NuVasive's 4 XLIF patents, and its efforts to prepare a claim construction order are underway. Moreover, fact discovery closes in less than 3 weeks (on December 16). NuVasive has spent thousands of attorney hours and hundreds of thousands of dollars in the past few months taking and defending depositions, reviewing documents, and conducting the *Markman* process. Plaintiffs should not be able to indefinitely postpone NuVasive's opportunity to present its case when the PTO has yet to grant an IPR on any NuVasive patent. So the Court should not adopt the blanket rule proposed by Plaintiffs or allow them to manipulate the schedule according to their whim. Plaintiffs' motion to stay should be denied.

## II.   ARGUMENT

The Court considers three factors in deciding whether to grant a stay pending a request for *inter partes* review: "(1) whether a stay will simplify the issues in question and trial of the case; (2) whether discovery is complete and whether a trial date has been set; and (3) whether a stay would unduly prejudice or present a clear tactical disadvantage to the nonmoving party." *I-Flow Corp. v. Apex Medical Techs., Inc.*, 2008 WL 2078623, at *1 (S.D. Cal. April 15, 2008). None of the factors here justifies a stay

based upon Warsaw's requests for *inter partes* review given how this Court has handled such motions in this case and Warsaw's delay.

## A.    The Potential Simplification of the Issues Does Not Favor a Stay.

This Court previously concluded that a stay was not justified pending a mere request for *inter partes* review, despite the potential simplification of the issues, when it declined to stay Warsaw's '997 patent before IPR had been instituted.  (Doc. No. 69.) The Court reached a similar conclusion regarding Warsaw's '696 patent, indicating that the Court would entertain a stay request only after IPR was granted.  (Doc. No. 82 at 5.)  The Court reached these conclusions at Warsaw's urging—Warsaw had strenuously argued that this factor did not justify a stay when IPR had been requested but the Patent Office had not yet decided whether to institute it, saying that "courts are routinely denying" such motions.  (Doc. No. 65 at 13.)  The Court should adhere to the same approach it applied before and find that this factor does not favor a stay until IPR is actually granted.  Neither of the "changed circumstances" that Warsaw relies upon in its brief should cause the Court to take a different approach this time.

### 1.    The Grant Rate for IPR Has Not Materially Changed.

There has been no material change to the statistics regarding the grant rate for filing IPR in the past few months.  When NuVasive briefed its motion to stay the '997 patent, it submitted data in its reply brief showing that 70 out of 75 requests had been granted—93%.  (Doc. No. 66 at 7, *citing* Doc. No. 66-2.)  The Court denied the motion to stay anyway.  (Doc. No. 69.)  Although the Patent Office has now acted on more requests for *inter partes* review, the grant rate has not changed much, and, if anything, it has slightly decreased to 89% (179 out of 201).  Warsaw incorrectly argues that, at the time of NuVasive's motion on the '997 patent, "the statistics provided little reliable guidance on the PTO's willingness to grant petitions for IPR," (Doc. No. 141-1 at 1), but Warsaw ignores the data NuVasive had submitted with its reply brief, which included 75 PTO decisions—a significant sample size.

What is more, the case that Warsaw cites at p. 1 of its brief to argue that "district courts are relying on these statistics to stay patent cases"—*Neste Oil OYJ v. Dynamics Fuels LLC*, 2013 WL 3353984 (D. Del. July 2, 2013) (Sleet, J.)—actually relies on statistics that were **older** than the statistics NuVasive has given this Court in the briefing on the motion to stay the '997 patent.  The *Neste* court cited statistics current as of May 6, 2013, *id.* at *4 n.4, while NuVasive had relied on statistics that were current as of May 17, 2013 when asking for a stay of the '997 patent.  (Doc. No. 66-1 at ¶ 2.)  So there is simply no material change to the statistics that would give this Court a reason to depart from its prior approach.

### 2.   The *Fresenius* Dissent Argues Against Warsaw's Approach.

The Federal Circuit's recent order denying *en banc* review in *Fresenius USA, Inc. v. Baxter Int'l, Inc.*, __ F.3d __, 2013 WL 5924588 (Fed. Cir. Nov. 5, 2013), is also not a changed circumstance that would require this Court to rethink its approach to motions to stay.  The court there held that if a Patent Office decision voiding a patent becomes final while there are still pending issues in the litigation, then the patentee cannot collect damages on a patent that has been conclusively declared invalid.  *Id.* at *1-3 (Dyk, J., concurring in the denial of rehearing); *see also* 721 F.3d 1330, 1336-47 (Fed. Cir. 2013) (panel decision).  There was nothing new about this holding—the panel justified its result based on a Federal Circuit case (*Mendenhall*) that is nearly two decades old and a Supreme Court case (*Simmons*) that was decided during Prohibition.  Moreover, the panel majority did not make any comments about whether district courts should grant stays pending Patent Office proceedings.

Warsaw's reliance on Judge O'Malley's dissenting opinion is misplaced.  As an initial matter, the dissenting opinion is just that—a dissent—not "recent precedent" as Warsaw claims at p. 2 of its brief.  A dissent does not compel this Court to change its analysis at all.  That aside, Judge O'Malley is actually arguing **for** the case-by-case approach that this Court has previously taken and **against** the blanket approach Warsaw is advocating here.  Judge O'Malley expresses concern that the result in

*Fresenius* will make it more difficult for patent owners to enforce legitimate patent rights by prompting district courts to always grant stays pending Patent Office proceedings

> The majority opinion here, coupled with this court's *Bosch* decision, will interfere with litigants' ability to access the courts to redress their grievances in a meaningful way and will drastically limit the case management options available to district court judges. . . .  And, when trial courts come to understand the fragility of their judgments, stays in the face of reexaminations—which the PTO grants over 92% of the time—will become inevitable.

*Id.* at 10.  But, in a footnote following the last sentence of that quote, Judge O'Malley urges district courts to analyze stays on a case-by-case approach and laments the fact that district courts may now feel pressure to stay every case, no matter what the circumstances:

> While stays might well be appropriate in the face of a reexamination, ***those determinations should be made on a case-by-case basis***, not thrust on district courts out of fear that the effort they put into the cases before them will be for naught.

*Id.* at *10 n.9.  The panel majority did not disagree with Judge O'Malley's belief that stay determinations "should be made on a case-by-case basis."

So if there is any lesson to be drawn from *Fresenius*, it is that this Court should adhere to the approach it articulated at the hearing on NuVasive's motion to stay the '997 patent and take each motion to stay on a case-by-case basis:

> ***I take each patent in each case individually, the specifics.***  Obviously in this case, I do believe you [NuVasive] moved as promptly [as] you could have.  Yes, you could have done it a week or two weeks sooner, but there's no delay here.  It does not appear to be a litigation strategy.  ***You didn't get up to the night before the Markman hearing or the day before trial and say, oh, we're going into reexam.***  So those arguments in the particular circumstances of this case aren't particularly compelling to me.

(Exhibit A (Transcript of May 30, 2013 Hearing) at 9:13-21.)  And, as discussed further below, this ***is*** a situation in which Warsaw delayed filing IPRs on some of NuVasive's patents and waited to raise of the issue of a stay until the eve of the *Markman* hearing.

## B.   The Stage of Litigation Weighs Against a Stay Because Discovery and Claim Construction Are Nearly Complete.

The stage of this litigation weighs heavily against a stay.  The Court has reviewed a pile of *Markman* briefing on most of the patents and held an all-day *Markman* hearing on 5 of the patents-in-suit.  The parties are now less than a month away from

1    completing fact discovery (which closes December 16), have taken numerous

2    depositions, and have many more depositions scheduled for the next three weeks.

3    Everyone has expended significant resources litigating NuVasive's patents, which

4    weighs strongly against a stay.  *See, e.g.*, *Interwoven, Inc. v. Vertical Computer Sys., Inc.*, 2012

5    WL 761692, at *4 (N.D.Cal. Mar. 8, 2012) (denying stay pending IPR where "the

6    parties have fully briefed the issue of claim construction, attended a *Markman* hearing,

7    and received a claim construction order" and concluding that "both the parties and the

8    Court have expended sufficient resources and time to render a stay untenable at this

9    point"); *I-Flow*, 2008 WL 2078623, at *2 (finding this factor weighed in favor of a stay

10   pending inter partes reexamination where "the claim construction hearing [was]

11   approaching quickly" and some discovery had occurred).

12        Warsaw's brief does not discuss this factor at all.  This omission is significant

13   both because Warsaw effectively ignores one of the three relevant factors and because

14   all the cases Warsaw cites at p. 5-6 that granted stays were in the very early stages.  *See*

15   *Neste Oil OYJ v. Dynamic Fuels, LLC*, 2013 WL 3353984, at *5 (D. Del. July 2, 2013)

16   ("This factor weighs strongly in favor of granting a stay, as the present case is in its

17   infancy. There has been no scheduling conference, no trial date has been set, and no

18   discovery has taken place."); *Software Rights Archive, LLC v. Facebook, Inc.*, 2013 WL

19   5225522, at *3 (N.D. Cal. Sept. 17, 2013) ("Although the court recognizes that the

20   parties have spent significant time and resources on discovery, discovery is not near

21   completion, only one witness has been deposed, claim construction briefing has not

22   commenced, deadlines for dispositive motions are still months out, and the court has

23   not set a trial date."); *Pi-Net Int'l, Inc. v. Focus Bus. Bank*, 2013 WL 4475940, at *3 (N.D.

24   Cal. Aug. 18, 2013) (granting stay where no *Markman* briefing had yet begun, no

25   "significant discovery" had taken place, and imposing the condition that the parties

26   would maintain the previously scheduled 2014 trial date if the Patent Office denied *inter*

27   *partes* review).  So none of these cases can support granting a stay here, where the

28

litigation is much further along, and both the Court and the parties have expended significant time and resources on it.

### C.   A Stay Would Unfairly Prejudice NuVasive While Rewarding Warsaw's Wait-and-See Tactics.

Warsaw's motion should also be denied because it is the very type of "litigation strategy" the Court has previously warned against, and it would impose significant prejudice on NuVasive.  The timing of Warsaw's requests for *inter partes* reexamination on NuVasive's 4 XLIF patents and the design patent (*i.e.*, the '782, '535, '767, '356, and D'922 patents) suggests that Warsaw purposely waited to file those IPR requests until it saw what the Patent Office would do with Warsaw's '997 patent.  In particular, Warsaw served invalidity contentions for all of NuVasive's patents on June 6, 2013.  (Doc. No. 60 at ¶ 2.)  But it waited more than 4 months to file its requests for *inter partes* review on the 4 XLIF patents and the design patent—waited, that is, until after the PTO instituted IPR on the '997 patent, as shown below:

- <u>March 7, 2013</u>:  NuVasive asserts its counterclaim patents.
- <u>June 6, 2013</u>:  Medtronic files invalidity contentions on all NuVasive patents.
- <u>September 23, 2013</u>:  PTO grants IPR on '997 patent.
- <u>October 8-22, 2013</u>:  Medtronic files IPR petitions on NuVasive's 4 XLIF patents and design patent.
- <u>November 7, 2013</u>:  *Markman* hearing on the 4 XLIF patents
- <u>November 20, 2013</u>:  Medtronic moves to stay the case.

Warsaw never raised with the Court the possibility that it might file *inter partes* review requests on all NuVasive's patents or that this might impact the schedule until just before the *Markman* hearing on the 4 XLIF patents.  (Doc. No. 125.)  And Warsaw did not formally ask for a stay until the present motion, filed almost two weeks after the *Markman* hearing.  (Doc. No. 141.)

Warsaw's delay in requesting *inter partes* review—and delay in telling the Court (or NuVasive) that it might seek such review—warrants denying a stay as to the 4 XLIF patents and the design patent.  This type of delay is exactly what the Court indicated

might justify denying a stay at the May 30 hearing. *See* Ex. A at 9:13-21 (noting that NuVasive's motion to stay the '997 patent, unlike those motion, "does not appear to be a litigation strategy. You didn't get up to the night before the Markman hearing or the day before trial and say, oh, we're going into reexam."). And other courts have agreed, finding that a stay is not appropriate when a party waits to ask for it until after claim construction:

> While not much discovery has occurred, Defendant did not file its inter partes review petitions until almost a year after being served with the complaint, and ***during that time the Court spent substantial effort construing the claims. The Court's expenditure of resources is an important factor in evaluating the stage of the proceedings***. That the schedule in this case set discovery to occur after claim construction does not mean that the case remains in its procedural infancy until discovery is well underway. While prior art searching and preparing PTO petitions takes time, and inter partes review was not available until mid-September 2012, ***Defendants could have filed its petitions and this motion before claim construction***. This factor weighs against a stay.

*Universal Electronics, Inc. v. Universal Remote Control, Inc.*, 2013 WL 1876459, *3-*7 (C.D. Cal. 2013) (emphasis added). In fact, Warsaw's delay in this case is much worse than the delay Judge Guilford dealt with in *Universal Electronics* because here the parties have expended much time on fact discovery, which is set to close in less than 3 weeks.

Warsaw's tactics have imposed significant prejudice on NuVasive and a significant burden on the Court. The burden on the Court is apparent—it had to prepare for and conduct an all-day *Markman* hearing, and its efforts on a claim construction order are underway. Likewise, NuVasive spent has spent many hundreds of thousands of dollars in the past few months on claim construction briefing, document discovery, and taking and defending fact depositions. Warsaw knew based on the scheduling order that the Court and NuVasive would have to devote significant time to this case, yet it said nary a word about its plans to seek a stay. After NuVasive has invested all of this time and money, Plaintiffs should not be able to indefinitely postpone the trial by filing strategically timed requests for IPR.

Warsaw's argument at p. 8-9 that the parties are in the same position because they have both requested *inter partes* review of the other's patents is incorrect. NuVasive requested IPR of Warsaw's patents promptly, while Warsaw purposely

waited to file its IPRs on the XLIF patents until after it saw what the Patent Office would do with the '997 patent.  Warsaw's attempt to point to NuVasive's narrowing of asserted claims in July 2013 should be rejected because Warsaw had already prepared invalidity contentions on the broader potential set of claims on June 6, 2013.  So Warsaw had all the material it needed for its IPR requests in June, but just waited to file them on the XLIF and design patents for 4 months.  Warsaw's citation at p. 9 to *Software Rights* does not support its position because (i) there was no evidence the defendant strategically waited to file IPR in that case, and (ii) as discussed above, discovery was "not near completion," only one witness had been deposed, and the parties had not even begun *Markman* briefing.  *Software Rights*, 2013 WL 5225522, at *3 (N.D. Cal. Sept. 17, 2013).  We are in a much different situation here.

Finally, NuVasive acknowledges that the parties are in a different situation with respect to NuVasive's two implant patents—the '334 and '156 patents.  For those patents, Warsaw filed its IPR requests more promptly—in August 2013—and it did so without waiting for the Patent Office to decide whether to institute IPR on the '997 patent (which happened in September 2013).  Recognizing these unique circumstances, the Court has not yet proceeded with a *Markman* hearing on these patents.  So, as Warsaw's brief notes at p. 1, footnote 2, the parties have been negotiating an agreement to stay those patents, along with Warsaw's '696 implant patent.  This only underscores why it is so important for the Court to decide stay requests on a patent-by-patent basis, rather than adopting Warsaw's blanket rule in favor of stays across the board.  There are truly unique circumstances that justify staying the implants patents and the '696 patent.  But those same circumstances also demonstrate that a stay is inappropriate on the 4 XLIF patents and the design patent, where Warsaw's strategic behavior has imposed significant costs on both NuVasive and the Court.

## III.   CONCLUSION

For the reasons above, NuVasive respectfully asks the Court to deny Warsaw's motion with respect to the 4 XLIF patents and the design patent (i.e., the '782, '535,

'767, '356, and D'922 patents).  With respect to the implant patents, NuVasive respectfully asks the Court to treat those in the same way that it decides to treat Warsaw's '696 patent.

Dated:  November 22, 2013

FISH & RICHARDSON P.C.

By: /s/ Craig E. Countryman
Craig E. Countryman

Attorneys for Defendant/Counterclaimant NUVASIVE, INC.

## **CERTIFICATE OF SERVICE**

The undersigned hereby certifies that a true and correct copy of the above and foregoing document has been served on November 22, 2013 to all counsel of record who are deemed to have consented to electronic service via the Court's CM/ECF system per Civ LR 5.4(d).

I declare under penalty of perjury under the laws of the United States of America that the above is true and correct.  Executed on November 22, 2013, at San Diego, California.

*/s/ Craig E. Countryman*
Craig E. Countryman

# EXHIBIT A

1                  UNITED STATES DISTRICT COURT

2                 SOUTHERN DISTRICT OF CALIFORNIA

3

4    WARSAW ORTHOPEDIC, INC., ET AL.,  )
                         PLAINTIFF,    )
5                                      )  CASE NO. 12CV2738-CAB(MDD)
          VS.                          )  SAN DIEGO, CALIFORNIA
6                                      )  MAY 30, 2013
     NUVASIVE, INC.,                   )
7                        DEFENDANT.    )
     _____)
8    NUVASIVE, INC.,                   )
                COUNTERCLAIMANT,       )
9                                      )
          VS.                          )
10                                     )
     WARSAW ORTHOPEDIC, INC., ET AL,   )
11         COUNTERCLAIM-DEFENDANTS.)

12

13

14              REPORTER'S TRANSCRIPT OF PROCEEDINGS

15                       MOTION HEARING

16        BEFORE THE HONORABLE CATHY ANN BENCIVENGO

17             UNITED STATES DISTRICT COURT JUDGE

18

19

20

21

22   COURT REPORTER:        MAURALEE A. RAMIREZ
                            OFFICIAL COURT REPORTER
23                          UNITED STATES DISTRICT COURT
                            333 WEST BROADWAY, SUITE 420
24                          SAN DIEGO, CALIFORNIA 92101
                            TEL.  619-994-2526
25                          ORDERTRANSCRIPT@GMAIL.COM

```
 1   A P P E A R A N C E S

 2   FOR THE PLAINTIFFS:

 3        ALEXANDER F. MACKINNON
          LUKE L. DAUCHOT
 4        NIMALKA R. WICKRAMSEKERA
          KIRKLAND & ELLIS, LLP
 5        333 SOUTH HOPE STREET
          LOS ANGELES, CALIFORNIA 90071
 6
     FOR THE DEFENDANT:
 7
          FRANK E. SCHERKENBACH
 8        FISH & RICHARDSON, P.C.
          ONE MARINA PARK DRIVE
 9        BOSTON, MASSACHUSETTS 02210-1878
          - AND -
10        MICHAEL A. AMON
          CRAIG E. COUNTRYMAN
11        TODD G. MILLER
          FISH & RICHARDSON, P.C.
12        12390 EL CAMINO REAL
          SAN DIEGO, CALIFORNIA 92130-2081
13

14

15

16   ALSO PRESENT:

17        MICHAEL J. KANE, PRINCIPAL, FISH & RICARDSON, P.C.

18        CHAD HANSON, WARSAW CLIENT REPRESENTATIVE

19        JAMES GARRETT, IN-HOUSE COUNSEL FOR NUVASIVE

20        JASON HANNON (PHONETIC), NUVASIVE CLIENT REPRESENTATIVE

21

22

23

24

25
```

1          SAN DIEGO, CALIFORNIA; THURSDAY, MAY 31, 2013; 10:00 A.M.

2          *THE CLERK:*  WE ARE ON RECORD THIS MORNING ON CASE

3    12CV2738-CAB(MDD), WARSAW ORTHOPEDIC INCORPORATED, ET AL.,

4    VERSUS NUVASIVE INCORPORATED, ON CALENDAR FOR A MOTION HEARING.

5          IF WE COULD PLEASE HAVE COUNSEL STATE THEIR

6    APPEARANCE, BEGINNING WITH PLAINTIFF COUNSEL.

7          *MR. DAUCHOT:*  GOOD MORNING, YOUR HONOR.  LUKE DAUCHOT

8    HERE ON BEHALF OF THE PLAINTIFF AND THE COUNTERDEFENDANTS.

9    WITH ME HERE TODAY ARE MS. WICKRAMASEKERA, WHO IS GOING TO BE

10   HANDLING THE STAY ISSUES, AND MR. MACKINNON, WHO IS GOING TO BE

11   DEALING WITH ROYALTY ISSUES THAT MAY COME UP.  ON THE PHONE IS

12   CHAD HANSON WITH MEDTRONIC.  HE JOINS US FROM MINNEAPOLIS.  HE

13   COULD NOT TRAVEL HERE FOR MEDICAL REASONS.

14         *THE COURT:*  THAT'S FINE.

15         *MR. DAUCHOT:*  AND WE THANK THE COURT FOR ACCOMMODATING

16   US.

17         *THE COURT:*  MR. HANSON, CAN YOU HEAR US?

18         *MR. HANSON:*  I CAN.  THANK YOU VERY MUCH, JUDGE.

19         *THE COURT:*  ALL RIGHT.  THANK YOU.

20         COUNSEL.

21         *MR. SCHERKENBACH:*  GOOD MORNING, YOUR HONOR.  FRANK

22   SCHERKENBACH FOR NUVASIVE.  I HAVE WITH ME MICHAEL AMON, CRAIG

23   COUNTRYMAN, MIKE KANE, WHO HAS NOT YET APPEARED AND HE HAS NOT

24   FILED A PRO HAC, BUT HE WILL.  HE HAS TO COMPLETE THE

25   PAPERWORK. I WANTED TO INTRODUCE HIM TO THE COURT.  TODD

1    MILLER, WHO HAS BEEN HERE BEFORE, AND OUR CLIENT

2    REPRESENTATIVES, MR. JASON HANNON (PHONETIC) AND MR. JIM

3    GARRET.

4         *THE COURT:*  THANK YOU.  WELCOME BACK.  IT'S GOOD TO

5    SEE YOU ALL AGAIN.  YOU HAVE MADE SOME SIGNIFICANT PROGRESS

6    SINCE THE LAST TIME WE TALKED ON THE OTHER CASE.  I WOULD LIKE

7    TO HAVE A DISCUSSION ABOUT SOME GENERAL HOUSEKEEPING IN

8    RELATION TO BOTH THE 08 CASE AS WELL AS THIS CASE WHEN WE

9    FINISH WITH THE STAY MOTION.

10        HERE'S WHAT I WOULD LIKE YOU TO FOCUS ON, BECAUSE MY

11   INCLINATION AT THE TIME, WHICH ACTUALLY WAS SORT OF SUMMARIZED

12   NICELY IN THE REPLY BRIEF BY NUVASIVE, IS TO LET YOU DO

13   WHATEVER YOU NEED TO DO FOR THE NEXT THREE MONTHS ON THE '997

14   PATENT, AND THEN WHEN YOU GET A DECISION FROM THE PTO IN

15   SEPTEMBER, IF THEY DECIDE TO GO FORWARD WITH THE REEXAM, WELL,

16   WHAT IS IT CALLED NOW, THE INTER PARTES REVIEW, THAT I WOULD BE

17   INCLINED AT THAT POINT THEN TO STAY AND NOT GO FORWARD WITH A

18   CLAIM CONSTRUCTION ON THAT PATENT BECAUSE OF THE LEVEL NOW OF

19   CONSIDERATION BY THE COURT OR BY THE PTO THAT THERE WOULD HAVE

20   TO BE A SIGNIFICANT ISSUE THEY WOULD BE LOOKING AT.  IT

21   WOULDN'T MAKE SENSE TO ME.

22        I COULD SEE SEGREGATING IT OUT THEN.  I'M NOT

23   CONVINCED THAT GIVEN THE OVERLAPS OF THE TECHNOLOGY, THE

24   PRODUCTS, THE HISTORY THAT THIS PATENT FLOWS FROM THE '611

25   PATENT, WHICH WAS PREVIOUSLY IN LITIGATION, AND THERE WAS LOTS

1   OF DISCOVERY RELATED TO THAT, THAT THE AMOUNT OF WORK THAT YOU

2   WOULD HAVE TO DO FOR THE NEXT THREE MONTHS TO HAVE THIS PATENT

3   READY TO GO, SHOULD THE PTO DECIDE NOT TO DO THE REVIEW, WOULD

4   BE SO BURDENSOME AND EXTRA COMPARED TO EVERYTHING ELSE YOU HAVE

5   TO DO, THAT STAYING IT WOULD MAKE SENSE.  WE MIGHT AS GET

6   ROLLING ON IT, AND THEN IF WE HAVE TO STAY IT, WE'D STAY IT.

7   SO THAT'S MY PRELIMINARY THOUGHT, AND I'M HAPPY TO HEAR

8   COMMENTS.

9          *MR. SCHERKENBACH:*  THANK YOU, YOUR HONOR.  I

10  APPRECIATE THOSE REMARKS, AND I'LL TRY TO ADDRESS THEM.  WE DO

11  HAVE SOME SLIDES REFLECTING OUR NOTES AND SO FORTH.  THOSE

12  MIGHT BE HELPFUL.  IF I MIGHT HAND THOSE UP TO YOU.

13         *THE COURT:*  SURE.

14         *MR. SCHERKENBACH:*  SO I THINK THE FIRST THING TO

15  OBSERVE IS, LET ME JUST PICK UP ON YOUR LAST POINT, AND THEN

16  I'LL SORT OF RESET HERE.  THERE IS DISCOVERY, SUBSTANTIAL

17  DISCOVERY, THAT WOULD BE SPECIFIC TO THIS PATENT THAT WE WOULD

18  HAVE TO DO ONLY BECAUSE THIS PATENT IS IN THE CASE, AND IT

19  WOULD NOT HAPPEN IF OTHER PATENTS -- IT WOULD NOT HAPPEN FOR

20  THE OTHER PATENTS, AND THAT IS ONE OF THE REASONS THAT WE THINK

21  A STAY IS APPROPRIATE.

22         NOW I'VE OUTLINED SOME OF THAT ON MY SLIDE 7, BUT THE

23  HIGHLIGHTS ARE THESE, THE '997 -- ACTUALLY LET ME BACK UP FOR

24  ONE MOMENT.  SO THE WARSAW PATENTS IN THE CASE STARTED AS THREE

25  PATENTS.  THERE IS THIS '146 OSTEOTECH PATENT WHICH THEY

1   ACQUIRED FROM ANOTHER COMPANY, OKAY, NOT AN ISSUE IN THIS

2   MOTION OR TODAY.

3          THE TWO OTHER PATENTS THEY ASSERTED ARE DR. MICHELSON

4   PATENTS.  THERE'S THE '430 PATENT WHICH RELATES TO THE IMPLANT

5   ITSELF.  THAT PATENT IS OFF THE TABLE.  IT IS -- WAS IN REEXAM

6   AND NOW HAS SORT OF OFFICIALLY BEEN KILLED OFF, AS IT WERE, IN

7   REEXAM.  THAT PATENT IS NEVER COMING BACK TO LIFE AS A RESULT

8   OF THE REEXAM WE INITIATED.

9          *THE COURT:*  I KNOW YOU MAY DISAGREE, BUT THAT'S FINE.

10          *MR. SCHERKENBACH:*  WELL, I DOUBT IT ACTUALLY.  THE

11   '997, IF IT'S ALLOWED IN THE CASE, OR ALLOWED TO PROCEED IN THE

12   CASE, I SHOULD SAY, WOULD BE THE ONLY DR. MICHELSON PATENT.

13   AND SO YOU WOULD HAVE A SUBSTANTIAL AMOUNT OF DISCOVERY THAT

14   YOU JUST WOULD NOT OTHERWISE HAVE BECAUSE DR. MICHELSON

15   WOULDN'T BE A WITNESS IN THE CASE.  AND IT'S NOT JUST SORT OF

16   HE HAPPENS TO BE AN INVENTOR ON A PATENT, HE IS THEIR STAR

17   TRIAL WITNESS.  THEY WILL BUILD THE CASE AROUND DR. MICHELSON.

18   THERE IS A WHOLE LOT OF WORK DO THAT WOULD NOT OTHERWISE BE

19   DONE IF DR. MICHELSON IS IN THE CASE.

20          *THE COURT:*  IN THE NEXT THREE MONTHS?  HAS TO BE DONE

21   FOR SEPTEMBER 25TH?

22          *MR. SCHERKENBACH:*  WELL, THERE ARE WHATEVER -- DO WE

23   NECESSARILY HAVE TO TAKE HIS DEPOSITION IN THE NEXT THREE

24   MONTHS?  NO, I WOULDN'T NECESSARILY SAY THAT, BUT WE DO HAVE TO

25   TAKE DISCOVERY ON ISSUES, VALIDITY ISSUES, THAT ARE SPECIFIC TO

1   THIS PATENT.  AND THIS PATENT GOES BACK TO '95.  AND THERE IS A

2   WHOLE LOT OF DISCOVERY THAT IS SPECIFIC TO WHETHER THIS PATENT

3   WAS INVALID FOR REASONS THAT DON'T PERTAIN TO THE OTHERS AT

4   ALL, CERTAINLY NOT THE NUVASIVE PATENTS AND CERTAINLY NOT THE

5   OSTEOTECH PATENT, AND WE BELIEVE IN GOOD FAITH WE'RE GOING TO

6   HAVE DEFENSES BASED ON A POTENTIAL ON-SALE BAR.

7        *THE COURT:*  BUT WE'RE NOT GOING TO HEAR ANY OF THAT

8   BEFORE SEPTEMBER 25TH.

9        *MR. SCHERKENBACH:*  NO, BUT WE'RE GOING TO TAKE --

10       *THE COURT:*  AND I DON'T KNOW THAT YOU NEED TO DO THAT

11  DISCOVERY IN THE NEXT THREE MONTHS.  YOU CAN START IT, BUT...

12       *MR. SCHERKENBACH:*  WELL, WE CAN START IT.  CERTAINLY

13  IN THE USUAL COURSE, IT WOULDN'T BE OUR PRACTICE TO DO NOTHING

14  FOR THREE MONTHS, DEVELOPING VALIDITY DEFENSES TO A PATENT AND

15  THEN SORT OF START THEN.  AND SO THAT'S A CHUNK OF WORK THAT,

16  IN OUR VIEW, HAS TO BE DONE, OR AT LEAST STARTED, IN A

17  MEANINGFUL WAY.

18       THE SECOND THING FOR US IS CLAIM CONSTRUCTION RELATED

19  TO THIS PATENT.  AND IF YOU LOOK AT THE -- ACTUALLY WE HAVE IT

20  ALSO ON SLIDE 7, HAPPY COINCIDENCE.  IF WE WAIT AROUND TO

21  SEPTEMBER 25TH, WE WILL HAVE DONE ALL OF THE CLAIM CONSTRUCTION

22  WORK.

23       *THE COURT:*  WELL, I HAVE A SOLUTION FOR THAT.  GIVEN

24  THE NUMBER OF PATENTS IN THE CASE, WE COULD ORDER THEM SO THAT

25  THIS ONE WOULD BE HEARD LAST AND GIVE YOU A DATE IN SEPTEMBER

1   TO EXCHANGE CLAIM CONSTRUCTION ON THIS PARTICULAR PATENT,

2   PRESUMING THAT IT ISN'T GOING TO BE STAYED.  BECAUSE THERE IS

3   CERTAINLY PLENTY OF WORK HERE TO DO ON NINE OTHER PATENTS, OR

4   POTENTIALLY TEN WITH THEIR MOTION TO AMEND IN THE CASE.  AND SO

5   I'M NOT GOING TO BE ABLE TO DO A CLAIM CONSTRUCTION HEARING ON

6   TEN PATENTS IN ONE DAY.  WE HAVE A DATE SET, BUT WE HAVE TO

7   TALK ABOUT THAT BECAUSE THAT'S NOT GOING TO HAPPEN ALL ON ONE

8   DAY.

9           SO MY THOUGHT ON THAT WOULD BE PULL THIS ONE OUT OF

10  YOUR CLAIM CONSTRUCTION BRIEFING SCHEDULE AND GIVE YOU A NEW

11  CLAIM CONSTRUCTION BRIEFING SCHEDULE IN SEPTEMBER FOR THIS

12  PATENT SHOULD IT NOT GO INTO REVIEW.

13          MR. SCHERKENBACH:  OKAY.  WE WOULD BE AMENDABLE TO

14  THAT.  I APPRECIATE THAT THOUGHT AND THAT ACCOMMODATION.  I DO

15  THINK IF THAT WERE TO HAPPEN, WE WOULD BE ADJUSTING TO ALLOW,

16  FOR EXAMPLE, FACT DISCOVERY WHENEVER IT IS THAT WE COULD GET TO

17  CLAIM CONSTRUCTION ON THE '997 IF IT WENT FORWARD.  AND SO THAT

18  WOULD BE APPRECIATED.

19          AND I HEAR YOU ON WHERE YOU'RE LEANING.  I GUESS WE

20  FEEL PRETTY STRONGLY THAT THIS IS A LITTLE BIT -- MORE THAN A

21  LITTLE BIT OF A GOOSE/GANDER SITUATION WHERE, YOU KNOW, IT

22  DOESN'T STRIKE US AS ENTIRELY FAIR FOR WARSAW TO NOW REAP THE

23  BENEFIT OF SUBSTANTIALLY THE SAME ARGUMENTS THEY WERE ON THE

24  OTHER SIDE OF ON PHASE I WHERE THEY PREVAILED AND GOT US

25  STAYED, AND SOUGHT A STAY JUST WHEN THEY FILED FOR REEXAMS.

1    THERE WAS NO DECISION.  NOW IT'S TRUE, THE COURT RULED ON THAT

2    SUBSEQUENTLY, BUT THE ARGUMENTS REALLY ARE MORE OR LESS THE

3    SAME.

4            AND I THINK THERE IS PARTICULAR REASON TO THINK THAT

5    THIS ONE IS WELL TAKEN BECAUSE IT'S NOT -- AND I WANTED TO

6    REALLY EMPHASIZE THIS TO THE COURT, I DON'T THINK YOU HAVE TO

7    BE CONCERNED ABOUT THINKING, GEE, IF I GRANT A STAY PENDING THE

8    FILING OF AN IPR IN THIS CASE, DO I HAVE TO DO IT IN EVERY

9    CASE, AND THAT MAY BE A LEGITIMATE CONCERN OF THE COURT TO

10   WORRY ABOUT SETTING SOME SORT OF PRECEDENT HERE.

11           *THE COURT:*  IT'S NOT.

12           *MR. SCHERKENBACH:*  IT'S NOT, OKAY.

13           *THE COURT:*  I TAKE EACH PATENT IN EACH CASE

14   INDIVIDUALLY, THE SPECIFICS.  OBVIOUSLY IN THIS CASE, I DO

15   BELIEVE YOU MOVED AS PROMPTLY THAT YOU COULD HAVE.  YES, YOU

16   COULD HAVE DONE IT A WEEK OR TWO WEEKS SOONER, BUT THERE'S NO

17   DELAY HERE.  IT DOES NOT APPEAR TO BE A LITIGATION STRATEGY.

18   YOU DIDN'T GET UP TO THE NIGHT BEFORE THE MARKMAN HEARING OR

19   THE DAY BEFORE TRIAL AND SAY, OH, WE'RE GO INTO REEXAM.  SO

20   THOSE ARGUMENTS IN THE PARTICULAR CIRCUMSTANCES OF THIS CASE

21   AREN'T PARTICULARLY COMPELLING TO ME.

22           I AM KIND OF CURIOUS WITH REGARD TO ANY ESTOPPEL

23   ISSUES HERE FROM NUVASIVE ON INVALIDITY CHALLENGES SINCE YOU

24   PARTICIPATE IN THIS PROCESS.  WHAT'S THE EFFECT OF A DENIAL TO

25   JUST DO THE REVIEW?

1          WOULD THE CHALLENGES RAISED REQUESTING THE INTER

2    PARTES REVIEW BE ESTOPPED FROM BEING ASSERTED IF THE PATENT

3    OFFICE MAKES A DECISION THAT THERE IS NOT A REASONABLE

4    LIKELIHOOD BASED ON THE QUESTIONS RAISED THAT ONE OR MORE OF

5    THE PATENT CLAIMS WOULD BE ABOUT JUST THE THRESHOLD QUESTION,

6    WITHOUT THE TRIAL, WOULD THAT IMPACT COME SEPTEMBER IF THEY

7    SAY, NO, WE'VE LOOK AT IT, WE'RE NOT GOING FORWARD ON THIS,

8    THERE'S NOT A REASONABLE LIKELIHOOD OF INVALIDITY, WHICH GIVEN

9    YOU HAVE A CLEAR AND CONVINCING EVIDENCE STANDARD AT TRIAL, IF

10   THEY DON'T EVEN THINK THERE'S A REASONABLE LIKELIHOOD, IT WOULD

11   SEEM HARD YOU COULD SAY, WE COULD PROVE IT BY CLEAR AND

12   CONVINCING EVIDENCE LATER.

13          BECAUSE THAT, TO ME, COULD BE A SIGNIFICANT ISSUE IF

14   THEY'RE GOING TO NOT EVEN HAVE THE REVIEW TO SAY, WELL, YOU

15   CAN'T EVEN RAISE THE THINGS YOU PRESENTED IN THE INTER PARTES

16   REVIEW TO THIS COURT AS INVALIDITY CHALLENGES.

17          *MR. SCHERKENBACH:*  SO THE ANSWER ISN'T HELPFUL TO ME

18   ON THIS MOTION, BUT THE ANSWER IS CLEAR, AND THAT IS, THERE IS

19   NO ESTOPPEL.  DENYING AN IPR RAISES NO ESTOPPEL.  IT HAS TO

20   HAPPEN.

21          I WILL SAY THOUGH, JUST TO RESPOND TO ONE PART OF YOUR

22   COMMENT, NAMELY, WHERE YOU SAY IT SEEMS TO YOU, IF THERE IS NO

23   IPR, HOW CAN THE SAME ART PREVAIL AT TRIAL IN FRONT OF A JURY

24   OR YOUR HONOR.  THE RULES ARE ACTUALLY VERY DIFFERENT, RIGHT.

25   IPR IS ONLY LIMITED TO PAPER, STRICTLY PRINTED PUBLICATIONS,

```
 1   AND IT'S ONLY SECTION 102, SECTION 103, SO ANTICIPATION

 2   OBVIOUSNESS.

 3          OBVIOUSLY AT TRIAL, THERE IS A LOT MORE AVAILABLE

 4   EVIDENCE TO SHOW THAT ANY GIVEN PIECE OF PRIOR ART ANTICIPATES

 5   OR RENDERS SOMETHING OBVIOUS, SO THE TRIBUNALS AREN'T DEALING

 6   WITH THE SAME INFORMATION.  BUT THERE IS A PARTICULAR REASON IN

 7   THIS CASE TO THINK THAT THIS IS -- YOU KNOW, THERE ARE THE

 8   STATISTICS, AND WARSAW SORT OF SAID, WELL, THOSE STATISTICS ARE

 9   IRRELEVANT.  WITH ALL DUE RESPECT, THEY AREN'T REALLY

10   IRRELEVANT.

11          WE'VE UPDATED OUR COUNT HERE, AND I THINK I HAVE IT ON

12   SLIDE 6, YOUR HONOR.  THERE'S NOW BEEN 90 DECISIONS ON IPR'S.

13   90.  AND 83 OF THEM HAVE BEEN GRANTED TO SOME DEGREE, MOST OF

14   THOSE ACROSS THE BOARD.  THAT'S PRETTY OVERWHELMING ODDS, AND

15   IT'S ACTUALLY ABOUT THE SAME PERCENTAGE AS IT WAS IN INTER

16   PARTES REEXAM WHEN MANY COURTS WOULD STAY ON THE BASIS OF A

17   FILE ON THE REEXAM.

18          NOW DOES THAT MEAN THIS ONE HAS A 93 CHANCE?  NO, I

19   KNOW HOW STATISTICS WORK, BUT IT IS THERE, AND IT IS, I THINK,

20   SIGNIFICANT.  THE OTHER THING THAT IS SIGNIFICANT IS THAT THIS

21   PATENT IS CLOSELY RELATED, YOU MENTIONED IT, I THINK YOU MIGHT

22   HAVE SAID...

23          THE COURT:  '661.

24          MR. SCHERKENBACH:  '661 IS THE PATENT, RIGHT.  NOW

25   THAT PATENT -- THIS PATENT IS CLOSELY RELATED TO THAT PATENT,
```

1    AND THAT PATENT HAS ESSENTIALLY BEEN LOST IN THE PATENT OFFICE

2    PROCEEDINGS.  WARSAW -- IN FACT, IT WAS SO PROBLEMATIC, THE

3    VALIDITY OF THAT, THAT THEY HAD TO GO AFFIRMATIVELY TO THE

4    PATENT OFFICE, SUBMIT A DECLARATION SAYING, THIS PATENT IS

5    INVALID AND WE WANT TO TRY TO FIX IT, AND THEY WERE

6    UNSUCCESSFUL.  EVEN THOUGH THEY AMENDED THE CLAIMS AND TRIED TO

7    NARROW THE CLAIMS, THEY WERE UNSUCCESSFUL.  AND THAT PATENT IS

8    EFFECTIVELY DEAD ALSO.

9          AND SO HERE YOU HAVE A CONTINUATION PATENT, A STRAIGHT

10   CONTINUATION PATENT OF THAT '661, AND WE'RE TELLING YOU, GUESS

11   WHAT, THE PATENT OFFICE IS HIGHLY LIKELY TO TAKE ANOTHER LOOK

12   AT THIS PATENT.  AND WE HAVE THE OBJECTIVE FACT THAT THE '661

13   HAS BEEN THROWN OUT BY THE PATENT OFFICE.  NOW WARSAW SAYS, OH,

14   THAT'S NOT GOING TO HAPPEN BECAUSE THE EXAMINER WHO ALLOWED

15   THIS PATENT KNEW ABOUT THE '661 REEXAM AND HE ALLOWED IT

16   ANYWAY, OKAY.  THAT'S SORT OF THE BEST THEY CAN DO.

17         YOU MIGHT BE INTERESTED TO KNOW THAT THE EXAMINER ON

18   THE ORIGINAL '661 WAS A GENTLEMAN NAMED MICHAEL BROWN, THE

19   PRIMARY EXAMINER.  HE ALLOWED THAT PATENT AND TURNED OUT TO BE

20   WRONG.  THE EXAMINER WHO ALLOWED THE '997 PATENT THAT WE'RE

21   HERE TODAY TALKING ABOUT WAS MICHAEL BROWN.  SO YES, HE ALLOWED

22   THE '997, AND HE DIDN'T THINK MUCH APPARENTLY OF WHAT HAPPENED

23   IN THE '661 REEXAM, BUT I DON'T SEE HOW ANYONE SHOULD BE TAKING

24   A LOT OF COMFORT IN THAT.  THE OBJECTIVE INDICATIONS HERE ARE

25   THAT THIS PATENT IS HIGHLY LIKELY TO BE PUT INTO REEXAM.

1          THE ONE OTHER THING THEY SAY, AND THIS IS SOMETHING

2     THEY MAKE A LOT OF IN THEIR PAPERS, OH, YOUR IPR PETITION ON

3     THE '997, YOU RELY ON COMBINATIONS OF MULTIPLE REFERENCES,

4     THREE REFERENCE COMBINATIONS, FOUR REFERENCE COMBINATIONS, SORT

5     OF IMPLYING THAT'S KIND OF A HAIL MARY.  WELL, AS WE ALSO

6     INDICATE ON OUR SLIDE 6, THE '430 PATENT, WHICH THEY HAD

7     ASSERTED AND WHICH HAS NOW BEEN ESSENTIALLY INVALIDATED IN

8     REEXAM, MANY OF THE GROUNDS THE PATENT OFFICE ADOPTED AND STUCK

9     TO THERE WERE MULTIPLE REFERENCE COMBINATIONS, OKAY.  SO THIS

10    HAPPENS ALL THE TIME.

11          AND WHAT IS CLEAR IN IPR -- AND, GRANTED, THIS IS A

12    NEW PROCEDURE, WE'RE ALL STILL GETTING USED TO IT -- THE

13    THREE-JUDGE PANELS WHO DEAL WITH THESE IPR'S, THEY DON'T CARE

14    WHAT ANYBODY HAS DONE BEFORE, FRANKLY.  THEY'RE NOT INTERESTED

15    IN WHAT THE EXAMINERS OF THE ORIGINAL CASE DID BEFORE.  THEY

16    TAKE A COMPLETELY FRESH LOOK, AND THEY HAVE BEEN VERY WILLING

17    TO TAKE A VERY HARD LOOK, AND THEY HAVE BEEN THROWING OUT LOTS

18    AND LOTS OF PATENTS.

19          SO THERE'S A PARTICULAR REASON TO THINK THIS ONE IS

20    GOING DOWN, OKAY.  AND I WILL SAY, WE SAID IT ON THE '430, WE

21    WERE RIGHT.  THE '661, WE TURNED OUT TO BE RIGHT.  WE SAID THAT

22    PATENT WAS INVALID.  WE WERE RIGHT.  SO THERE IS SOME HISTORY

23    HERE.

24          THE LAST POINT IS THIS, AND THIS MAY BE SOMETHING YOUR

25    HONOR REFERRED TO AT THE OUTSET WHEN YOU SAID YOU WANTED TO

1   TALK ABOUT MORE HOUSEKEEPING, MORE GENERAL THINGS.  WE HAVE

2   PHASE I HANGING OUT THERE, OKAY.  THIS PATENT IS THE POSTER

3   CHILD IN THIS CASE FOR ALMOST COMPLETE OVERLAP WITH PHASE I.

4   '661 PATENT WAS IN PHASE I.  THE '973 PATENT, WHICH IS THE

5   MARQUEE PATENT IN APPEAL ON PHASE I, OVERLAPS SUBSTANTIALLY

6   WITH THE '997.

7       WE MADE THAT POINT IN THE BRIEFING.  I HAVE SOME

8   SLIDES ON IT.  I CAN GO THROUGH IT.  THEY DON'T DISPUTE IT.  SO

9   YOU NOT ONLY HAVE A PATENT THAT IS LIKELY TO BE PUT INTO IPR,

10   BUT EVEN APART FROM THAT, YOU HAVE THIS EXTENUATING

11   CIRCUMSTANCE OF A PARALLEL PROCEEDING, I HOPE SOON, APPEAL

12   THAT'S GOING TO DEAL WITH -- THAT'S GOING TO DEAL --

13       *THE COURT:*  IS THAT YOUR POLITE WAY OF SAYING I NEED

14   TO GET SOMETHING DONE?

15       *MR. SCHERKENBACH:*  I THINK WE ALL WANT TO GET THAT ONE

16   GOING, YOUR HONOR.  REALLY, IN ALL SERIOUSNESS, THE ISSUES, THE

17   OVERLAP IS VERY SIGNIFICANT.  IF YOU LOOK ON OUR SLIDE 4, WE'RE

18   TALKING ABOUT THE SPECIFICATIONS ARE LARGELY THE SAME IN THESE

19   PATENTS.  THEY HAVE THE SAME INVENTOR, THEY CLAIM PRIORITY,

20   THEY BOTH CLAIM PRIORITY TO THE '661 PATENT, LARGELY THE SAME

21   PRIOR ART IS IMPLICATED.

22       IN FACT, WARSAW, IN ITS BRIEFING HERE, SORT OF THREW A

23   FEW ROCKS AT US FOR NOT DISCLOSING SOME OF THE LITIGATION

24   FINDINGS ABOUT THE '973 TO THE PTO DURING THE '997.  SO THEY'RE

25   LIKE THIS (GESTURING), OKAY.  THERE'S NO QUESTION, I THINK,

1    THAT WHAT HAPPENS WITH THE VALIDITY OF THE '973 ON APPEAL IN

2    PHASE I IS GOING TO AFFECT THIS '997 PATENT.

3            APART FROM THAT, THERE'S THE DAMAGES QUESTION, WHICH I

4    THINK IS EVEN SIMPLER.  THAT'S OUR SLIDE 5.  IT'S ACTUALLY VERY

5    HARD FOR US TO SEE HOW AT THE END OF THE DAY, WE PUT ALL THESE

6    RESOURCES INTO LITIGATING THAT '997 PATENT, AND MAYBE THE

7    PATENT OFFICE PUTS IT IN IPR AND WE NEVER SEE IT AGAIN.  MAYBE

8    WE GET TO TRIAL, OKAY.  WHAT ARE THEY GOING TO ASK FOR AND

9    RECOVER ON THIS PATENT THAT THEY DIDN'T ALREADY GET, IN OUR

10   VIEW, AS EXCESSIVE AWARD IN THE FIRST CASE?

11           *THE COURT:*  WELL, THEY CAN ONLY GET ANYTHING THAT

12   STARTED SINCE AUGUST 28TH, 2012.

13           *MR. SCHERKENBACH:*  THERE IS A TIME.  BUT THEY'RE

14   SEEKING AN ONGOING ROYALTY.  SO THEY CAN'T HAVE IT BOTH WAYS.

15           *THE COURT:*  IT'S A DIFFERENT PATENT.

16           *MR. SCHERKENBACH:*  SAY AGAIN.

17           *THE COURT:*  IT'S A DIFFERENT PATENT.  IT'S AN

18   INTERESTING QUESTION.  YOU RAISED IT, AND I'VE BEEN STRUGGLING

19   WITH IT BECAUSE HOW MANY ROYALTIES ARE WE GOING TO PAY IF

20   THEY'RE, IN FACT, THE SAME PRODUCTS --

21           *MR. SCHERKENBACH:*  RIGHT.

22           *THE COURT:*  -- FOR INFRINGEMENT.  BUT IF THIS IS A

23   METHOD AND YOU PREVIOUSLY HAD AN APPARATUS, I DON'T KNOW.  I

24   HAVE TELL YOU OFFHAND.  I DIDN'T PULL IT UP, THE '973 OR --

25           *MR. SCHERKENBACH:*  '973 IS THE WIDGET.

```
 1          THE COURT:  IS THE APPARATUS, OKAY.  SO IF YOU'RE

 2   PAYING FOR THE APPARATUS, DOES IT IMPLY THAT YOU CAN THEN USE

 3   IT, AND THE METHOD IS, THEREFORE, COVERED?  OR DO YOU HAVE TO

 4   PAY EXTRA TO DO THE METHOD, AND IS IT ONLY PRACTICING THE

 5   METHOD SINCE AUGUST 28TH, 2012?

 6          MR. SCHERKENBACH:  I DON'T KNOW THE ANSWERS.

 7          THE COURT:  I DON'T KNOW THE ANSWERS TO THOSE

 8   QUESTIONS.

 9          MR. SCHERKENBACH:  BUT HERE'S WHAT I DO KNOW, AND I

10   THINK WHAT EVERYBODY KNOWS, HOW THE FEDERAL CIRCUIT LOOKS AT

11   THE DAMAGES ANALYSIS THAT WAS DONE AND WHAT WAS AWARDED FOR THE

12   '973 PATENT IS GOING TO HAVE A HUGE IMPACT ON WHAT THE THEORY

13   CAN BE ON THE '997.  IT'S INESCAPABLE.  AND AGAIN, IF YOU LOOK

14   AT THE ONGOING ROYALTY PIECE OF THAT, THEY HAVE ASKED YOU FOR A

15   36-PERCENT ROYALTY.

16          THE COURT:  I APPRECIATE THAT.  AND THAT WOULD BE AN

17   ARGUMENT IF WE CAME BACK IN SEPTEMBER AND THIS WENT INTO REVIEW

18   AND THE PLAINTIFFS WANTED TO ARGUE, WELL, NOW THAT WE'RE THIS

19   FAR INTO IT, WE SHOULDN'T STOP.  WELL, NO, IF IT GETS REVIEWED,

20   THIS PATENT IS GETTING STAYED, BECAUSE I'M NOT GOING TO ADDRESS

21   ALL THOSE ISSUES AND WE'RE NOT GOING TO DO DAMAGES DISCOVERY IN

22   THE NEXT THREE MONTHS AND WE'RE NOT GOING TO BE ADVANCING

23   THEORIES ON ROYALTIES AND EVERYTHING ELSE, NOT IN THE NEXT

24   THREE MONTHS.  THAT'S ALL DISCOVERY THAT WON'T HAPPEN UNTIL

25   PROBABLY AFTER CLAIM CONSTRUCTION ANYWAY.
```

1           SO AS A PRACTICAL MATTER, THE REAL CONCERN I HAVE IS,

2    WHAT DISCOVERY YOU WOULD REALLY HAVE TO DO IN THE NEXT THREE

3    MONTHS THAT WOULD OTHERWISE BE SET ASIDE AND AVOIDED AND COULD

4    POTENTIALLY BECOME UNNECESSARY SHOULD THIS, A, GO INTO REVIEW

5    AND, B, BE INVALIDATED IN REVIEW?  I DON'T WANT TO BE IN A

6    PLACE IN SEPTEMBER IF THEY DON'T DO THE REVIEW TO HAVE THIS

7    PATENT BE SO OFF THE TRACKS WITH EVERYTHING ELSE GOING ON IN

8    THIS CASE THAT IT WOULD DERAIL THE PROCESS MOVING FORWARD.

9           I CAN SEE STAGING IT TO THE END OF CLAIM CONSTRUCTION

10   SO THAT YOU CAN BRIEF SEPARATELY ON CLAIM CONSTRUCTION ISSUES

11   ON THIS PATENT.  HAVE YOU DONE INVALIDITY CONTENTIONS IN THIS

12   CASE?

13           *MR. SCHERKENBACH:*  NO, THEY'RE JUNE 6TH.

14           *THE COURT:*  WE CAN SEPARATE THIS ONE.  IN ESSENCE, IT

15   WOULD BE ALMOST LIKE A STAY, BUT IF YOU HAVE TO DO DISCOVERY

16   AND RESPOND TO DISCOVERY IN THE INTERIM, AGAIN, FOR THREE

17   MONTHS, I'M NOT SEEING A HUGE BURDEN HERE, BUT WE COULD SET

18   SPECIFIC DATES TO PROVIDE YOUR INVALIDITY CONTENTIONS AND THE

19   CLAIM CONSTRUCTION, AND WE'LL DO THAT IN SEPTEMBER AFTER WE GET

20   A DECISION FROM THE PATENT OFFICE.  AND IT MIGHT BE ACCELERATED

21   A LITTLE BIT BECAUSE IT IS THE ONE PATENT.  AND WE ARE GOING TO

22   TALK ABOUT HOW MANY CLAIMS ARE GETTING ASSERTED IN THESE CASES

23   BECAUSE I'M GOING ON PUT SOME BRAKES ON THE NUMBERS BECAUSE

24   THERE'S A LOT OF CLAIMS, AND WE'RE NOT DOING ALL OF THEM.

25           BUT IN TERMS OF JUST DOING YOUR OWN DISCOVERY,

1    REQUESTS FROM THEM FROM REQUESTS TO YOU, I'M NOT SEEING A HUGE

2    BURDEN FOR THREE MONTHS OF TIME TO HOLD OFF ON THIS DECISION.

3          *MR. SCHERKENBACH:*  THE CANDID ANSWER, IF YOU PRESUME

4    THAT WE PUT OFF EVERYTHING WE CAN PUT OFF UNTIL AFTER SEPTEMBER

5    25 AND THERE'S ENOUGH TIME LEFT IN THE DISCOVERY PERIOD, I'M

6    NOT GOING TO TELL YOU THERE IS EXTREME PREJUDICE OR BURDEN ON

7    NUVASIVE TO DO SORT OF THE MINIMAL THAT HAS TO BE DONE.

8          *THE COURT:*  OKAY.

9          *MR. SCHERKENBACH:*  THAT'S THE TRUTH, OKAY.  WHETHER WE

10   WOULD, IN FACT, DO NOTHING UNTIL SEPTEMBER 25 OR ALMOST NOTHING

11   IS UNLIKELY, BUT THAT'S THE TRUTH.

12          BUT IF I COULD MAKE ONE MORE POINT, THEN I KNOW YOU'RE

13   READY TO HEAR FROM OPPOSING COUNSEL.  I UNDERSTAND THIS IS AN

14   ISSUE THAT AT THE END OF THE DAY VARIES HIGHLY FROM JUDGE TO

15   JUDGE, AND YOU'VE SORT OF GOT TO GO WITH YOUR GUT ON IT.  WE

16   RESPECT THAT.  I JUST WANTED TO NOTE, BECAUSE WE DIDN'T HAVE A

17   CHANCE TO DO IT IN OUR PAPERS, FOR ALL THEIR CASES, IF YOU LOOK

18   AT THE CASES THAT THEY CITE AS DENYING STAYS WHEN A MERE

19   REQUEST HAS BEEN FILED, WHETHER IN THE REEXAM CONTEXT OR IPR

20   CONTEXT, ONE OF THE THINGS YOU'RE GOING TO SEE, YOUR CLERK IS

21   GOING TO SEE IS, NO. 1, NONE OF THEM INVOLVES THE SORT OF

22   EXTENUATING CIRCUMSTANCES WE HAVE HERE OF A HISTORY OF

23   PROSECUTION THAT SUGGESTS THIS ONE IS GOING GO DOWN IN A

24   PARALLEL PHASE I APPEAL.

25          BUT EVEN PUTTING THOSE CASES ASIDE, THOSE CASES RELY

1    ON FACTORS THAT EVEN WARSAW ITSELF ISN'T RELYING ON.  IT'S SORT

2    OF A LITTLE BIT OF A SURREAL SITUATION.  FOR EXAMPLE, MANY OF

3    THE CASES WHERE STAYS WERE DENIED INVOLVED COMPETITORS, THE

4    THEORY BEING THAT THERE IS MORE PREJUDICE IN THAT CASE WHERE

5    BOTH SIDES ARE PRACTICING AND SOMEBODY MIGHT NOT GET THEIR

6    INJUNCTION AS SOON, OKAY.

7         WELL, NO. 1, WARSAW CAN'T EVEN MAKE THAT ARGUMENT AND

8    HASN'T MADE THAT ARGUMENT BECAUSE IN PHASE I, WE WERE COMPETING

9    JUST AS MUCH AS WE ARE NOW, AND THEY SOUGHT A STAY AND A GOT A

10   STAY, OKAY.  SO THAT WHOLE RATIONALE THAT'S IN THE CASES IS OFF

11   THE TABLE HERE.  AND I WOULD SAY IN, NO. 2, OF COURSE, THE

12   COURT BEING THE BENEFIT OF THE COURT ALREADY DECIDING THIS CASE

13   COULD CHANGE IN THE NEXT PHASE, AND LET'S PRESUME THERE AREN'T

14   ANY MASSIVE CHANGES IN THE MARKETPLACE, THE INJUNCTION ISN'T

15   APPROPRIATE IN THIS CASE.  SO THAT'S ANOTHER REASON

16   CONSIDERATION IS OFF THE TABLE.

17        THERE ARE OTHER FACTORS THAT WERE REAL IMPORTANT TO

18   THE CONSIDERATION AND THE OUTCOME OF THOSE CASES THAT SIMPLY

19   DON'T APPLY HERE.  SO I THINK WITH THAT, I WILL STAND DOWN,

20   UNLESS YOUR HONOR --

21        *THE COURT:* NO, THAT'S FINE.  THANK YOU.

22        *MS. WICKRAMASEKERA:* GOOD MORNING, YOUR HONOR.

23        *THE COURT:* GOOD MORNING.

24        *MS. WICKRAMASEKERA:* YOUR HONOR, WE WANTED TO NOTE

25   WITH RESPECT TO THE PTO DECIDING IN SEPTEMBER ON NUVASIVE'S TWO

1    REQUESTS, I JUST WANTED TO MAKE CLEAR, NUVASIVE HAS TWO

2    REQUESTS PENDING, AND THE ASSERTED CLAIMS SPAN BOTH, AND SO I

3    THINK THAT YOUR HONOR WOULD NEED TO REVISIT THE ISSUE AT THAT

4    POINT IN TIME ONCE THE PTO MAKES ITS DECISION TO SEE WHAT THAT

5    DECISION IS AND HOW IT AFFECTS THE ASSERTED CLAIMS.  IN ORDER

6    FOR ALL OF THE ASSERTED CLAIMS TO BE AFFECTED, NUVASIVE'S

7    REQUEST WOULD BOTH HAVE TO BE GRANTED IN THEIR ENTIRETY.  SO

8    THAT'S JUST ONE POINT.

9         *THE COURT:*  I UNDERSTAND THAT.  THEY'RE SEPARATED OUT.

10   THERE'S ONE THAT'S RELATED TO METHOD 1 AND 2 THROUGH 8,

11   DEPENDENT CLAIMS, AND THEN THE OTHER ONE IS THE METHOD AT 17

12   AND 24.

13        *MS. WICKRAMASEKERA:*  THAT'S RIGHT.

14        *THE COURT:*  AND IF THE REVIEW ONLY GOES TO ONE OF THE

15   PETITIONS AND THE OTHER ONE IS DENIED, THEN WE WOULD MOST

16   LIKELY PROCEED ON THE ONE THAT WAS DENIED, AND IT WOULD BE UP

17   TO YOU TO DECIDE WHETHER OR NOT YOU WANTED TO EVEN CONTINUE TO

18   ASSERT THE CLAIMS THAT WERE UNDER REVIEW.  BUT, YES, I

19   UNDERSTAND THAT, AND I OBVIOUSLY HAVE TO LOOK AT THE SPECIFICS

20   OF THE DECISION.  OKAY.  GO AHEAD.

21        *MS. WICKRAMASEKERA:*  THE OTHER POINT, YOUR HONOR ASKED

22   WHAT DISCOVERY NUVASIVE WOULD NEED TO TAKE IN THE NEXT THREE

23   MONTHS ON THE '997 PATENTS THAT COULD BE PUT OFF.  YOUR HONOR,

24   THE ANSWER IS NO DISCOVERY REALLY THAT'S IN THE '997 CAN BE PUT

25   OFF BECAUSE IT IS RELEVANT TO OUR INVALIDITY CONTENTIONS.

1    DR. MICHELSON'S LATERAL METHODS ARE PRIOR ART TO NUVASIVE'S

2    PATENTS.

3            NUVASIVE HAS EIGHT PATENTS IN THIS CASE.  THEY ALL

4    RELATE TO THE SAME SPACE, LATERAL METHODS FOR SPINE SURGERY.

5    TWO OF THOSE PATENTS ARE IMPLANT PATENTS.  THEY'RE NEARLY

6    IDENTICAL TO DR. MICHELSON'S '973 PATENT, EXCEPT THAT THEY HAVE

7    MARKERS ON THEM.

8            THE REMAINING PATENTS THAT NUVASIVE HAD RELATE TO

9    EITHER METHODS OR DILATORS.  THESE ARE ALL RELATED TO

10   DR. MICHELSON'S LATERAL METHODS.  DR. MICHELSON'S INVENTIONS

11   ARE PRIOR ART, AND PLAINTIFFS INTEND TO RELY ON THEM AND WILL

12   BE SUBMITTING INVALIDITY CONTENTIONS WHICH OUTLINE THESE CLAIMS

13   NEXT WEEK.

14           SO THERE IS NO DISCOVERY RELATED TO DR. MICHELSON.  AS

15   MUCH AS NUVASIVE WOULD LIKE TO AVOID HAVING DR. MICHELSON IN

16   THE CASE, THAT JUST CAN'T HAPPEN BECAUSE HIS INVENTIONS ARE

17   STILL RELEVANT.

18           *THE COURT:*  YES, BUT WAIT A MINUTE.  YOU'RE GOING TO

19   PUT FORTH HIS PATENTS, HIS WORK, HIS OPINIONS, WHICH AGAIN

20   THAT'S FOR INVALIDITY, WHICH IS GOING TO HAPPEN DOWNSTREAM AT

21   SOME POINT AFTER CLAIM CONSTRUCTION, BUT THAT DOESN'T MEAN THEY

22   HAVE TO DEPOSE HIM.  THAT'S YOUR POSITION.

23           *MS. WICKRAMASEKERA:*  RIGHT.  IF THEY CHOOSE NOT TO

24   DEPOSE HIM, THAT'S THEIR DECISION.

25           *THE COURT:*  THEY CAN DEPOSE HIM LATER.  I WOULD NOT BE

1    ADVERSE TO THEM BEING ALLOWED TO DEPOSE HIM ON HIS POSITIONS

2    REGARDING THE VALIDITY OF THE PATENTS THEY'RE ASSERTING AND

3    CONTINUE THE DEPOSITION WITH REGARD TO THE VALIDITY OF HIS

4    PATENT FOR A LATER DATE.  BUT WHY WOULD THEY EVEN HAVE TO TAKE

5    HIS DEPOSITION PRIOR TO SEPTEMBER?

6            *MS. WICKRAMASEKERA:*  WELL, THEY DON'T HAVE TO TAKE THE

7    DEPOSITION PRIOR TO SEPTEMBER.  WE HAVE A CLOSER, FOR FACT

8    DISCOVERY THAT RELATES BOTH TO INVALIDITY AND THE INFRINGEMENT.

9    AND MY ONLY POINT, YOUR HONOR, IS THAT DR. MICHELSON WILL

10   REMAIN IN THE CASE.

11           *THE COURT:*  ALL RIGHT, I UNDERSTAND.

12           *MS. WICKRAMASEKERA:*  YOUR HONOR, NUVASIVE HAS ALSO

13   MADE THE POINT THAT THERE IS AN EXTENSIVE AMOUNT OF DISCOVERY

14   THAT WOULD NEED TO OCCUR IN THE NEXT THREE MONTHS.  AS YOUR

15   HONOR KNOWS, THE PATENT LOCAL RULES IN THIS DISTRICT HAVE BEEN

16   AMENDED RECENTLY.  A LOT OF THESE RELEVANT DOCUMENTS HAVE

17   ALREADY BEEN PRODUCED.

18           THE PARTIES HAVE ALREADY PRODUCED DOCUMENTS RELATED TO

19   DESIGN, CONCEPTION, MARKETING, CONTRACTS, PATENTS, THE

20   INFORMATION SHOWING THE ACCUSED UNDERLYING PRODUCTS.  WE HAVE

21   ALREADY PRODUCED THAT INFORMATION.  THAT INFORMATION IS NOW

22   REQUIRED TO BE PRODUCED AT THE TIME THE PARTIES SERVE THEIR

23   INFRINGEMENT CONTENTIONS.

24           THE REMAINING RELEVANT DOCUMENTS WILL BE PRODUCED NEXT

25   WEEK CONCURRENT WITH THE INVALIDITY CONTENTIONS.  THE MAJORITY

1  OF THE DOCUMENTS RELEVANT TO THIS PATENT INFRINGEMENT SUIT HAVE

2  ALREADY BEEN PRODUCED, AND ESPECIALLY IN MY MODEL ESI ORDER

3  WHICH SIGNIFICANTLY LIMITS ESI DISCOVERY, THERE'S NOT A LOT

4  LEFT.  SO THIS DISCOVERY HAS ALREADY OCCURRED.

5      *THE COURT:*  WHAT'S YOUR POSITION SHOULD THERE BE A

6  DECISION BY THE PTO IN SEPTEMBER TO REVIEW BOTH PETITIONS THAT

7  THEY FILED ON THIS PATENT?

8      *MS. WICKRAMASEKERA:*  WELL, I THINK THAT WOULD DEPEND.

9  ASSUMING THAT IT COVERS ALL OF THE ASSERTED CLAIMS OR -- I

10  GUESS THAT WOULD DEPEND ON WHAT THAT DECISION LOOKS LIKE,

11  BECAUSE EVEN IF THEY GRANT BOTH OF THEIR REQUESTS IN PART, WE

12  WOULD HAVE TO DETERMINE WHETHER IT COVERS ALL OF THE ASSERTED

13  CLAIMS OR NOT.  AND, FRANKLY, YOUR HONOR, WE WOULD HAVE TO SEE

14  THAT DECISION.  WE WOULD HAVE TO WAIT TO SEE THAT DECISION.  I

15  THINK THAT THERE ARE A LOT OF FACT-SPECIFIC OR CASE-SPECIFIC

16  ISSUES THERE.

17      *THE COURT:*  ALL RIGHT.  UNDERSTANDING THAT THE COURT

18  WILL NOT HEAR AN ARGUMENT AT THAT POINT, THAT WE ARE NOW SO FAR

19  INTO THIS CASE BECAUSE THREE MONTH MONTHS HAVE GONE BY WHEN

20  YOUR ARGUMENT TODAY IS THAT IT WOULD BE PREMATURE FOR ME TO

21  DECIDE THAT CASE PENDING THAT DECISION, IF I WAIT UNTIL THAT

22  DECISION, I WILL NOT ENTERTAIN AN ARGUMENT THAT NOW IT'S TOO

23  LATE TO STAY THE CASE BECAUSE DISCOVERY HAS BEEN DONE.  I WANT

24  TO KEEP THESE CASES TRACKING.  I THINK A CERTAIN AMOUNT OF

25  DISCOVERY CAN AND SHOULD BE DONE IN THOSE THREE MONTHS.  I

1    DON'T THINK IT WOULD BE EITHER EXCESSIVE OR PARTICULARLY

2    BURDENSOME SHOULD THE CASE GO INTO REVIEW, THE PATENT.

3            BUT IF THE OTHER FACTORS THAT THE COURT HAS TO

4    CONSIDER, PARTICULARLY WHETHER IT'S GOING TO NARROW THE ISSUES

5    FOR LITIGATION AND THERE'S A POSITION THE PLAINTIFFS CAN TAKE

6    THAT THEY CAN PROCEED WITH THIS PATENT BECAUSE AN INDEPENDENT

7    CLAIM IS NOT BEING REVIEWED AND, THEREFORE, YOU COULD GO

8    FORWARD ON ONE OF THE INDEPENDENT CLAIMS, THEN, YES, THEN

9    WHETHER OR NOT I STAY IT MIGHT DEPEND ON WHAT'S BEING REVIEWED.

10           BUT I REALLY DON'T WANT TO HEAR ABOUT UNDUE PREJUDICE

11   AND TIMING, STRATEGIC TIMING IN SEPTEMBER, BECAUSE BASICALLY IF

12   I DON'T DO THE STAY NOW BECAUSE YOU'RE TELLING ME IT'S

13   PREMATURE, I'M NOT GOING TO HEAR THAT IT'S TOO LATE IN

14   SEPTEMBER TO DO IT.

15           *MS. WICKRAMASEKERA:*  I UNDERSTAND, YOUR HONOR.  I

16   THINK THAT ONE POTENTIAL RESOLUTION FOR THAT WOULD BE TO DENY

17   THE STAY WITHOUT PREJUDICE AT THIS POINT TO ALLOW NUVASIVE TO

18   RAISE THE MOTION AGAIN, THE MOTION TO STAY, ONCE THE PTO ISSUES

19   A DECISION, AND THEN THE PARTIES CAN EVALUATE WHAT THAT

20   DECISION LOOKS LIKE AT THAT POINT AND BRIEF THAT FOR THE COURT,

21   SO THE COURT CAN HAVE AN IDEA AS TO WHAT ISSUES MAY BE

22   RESOLVED.

23           *THE COURT:*  ALL RIGHT.  ANYTHING ELSE YOU WANT TO PUT

24   ON THE RECORD?

25           THANK YOU.

1           *MR. SCHERKENBACH:*  JUST ON THAT LAST POINT, I DO THINK

2    THE RIGHT THING TO DO, I GUESS WHERE YOU'RE HEADED, IS DENY

3    WITHOUT PREJUDICE UNDER THE CIRCUMSTANCES.  THIS IS NOT

4    PROBABLY MATERIAL, BUT JUST SO THE RECORD IS CLEAR, THE NOTION

5    THAT DR. MICHELSON'S PRIOR ART IS RELEVANT TO OUR PATENTS IS

6    SOMETHING NUVASIVE FINDS QUITE SURPRISING.  THERE ARE LOTS AND

7    LOTS OF THINGS IN OUR PATENTS THAT DR. MICHELSON NEVER DREAMED

8    OF, SO WITH ALL DUE RESPECT, I DON'T THINK THAT'S GOING

9    ANYWHERE, BUT YOU DON'T HAVE TO DECIDE THAT TODAY.

10          *THE COURT:*  NO.  OKAY.  THANK YOU.

11          ALL RIGHT.  THE COURT IS GOING TO DENY THE REQUEST TO

12   STAY.  LET'S BE CLEAR ON THIS, BECAUSE THE MOTION WAS TO STAY

13   PROCEEDINGS ON BOTH THE '430 AND THE '997.  THERE IS NO

14   OBJECTION FROM THE PLAINTIFFS TO THE STAY ON THE '430, SO

15   UNLESS THERE IS AN INDICATION THAT, IN FACT, THAT PATENT IS IN

16   SUCH A POSITION THAT YOU'RE PLANNING ON WITHDRAWING IT, I WILL

17   GRANT THE STAY AS TO THE '430 BECAUSE THAT WAS JOINTLY

18   PROPOSED, AND IT SOUNDS LIKE THE STATUS OF THAT PATENT SUGGESTS

19   THAT THAT IS THE APPROPRIATE POSITION RIGHT NOW.

20          WITH REGARD TO THE '997, THE MOTION IS DENIED IN PART

21   WITHOUT PREJUDICE AS TO THE STAY ON THAT PATENT.  HOWEVER, IN

22   RELATION TO THAT DENIAL, THE COURT DOES EXCUSE FROM ANY OF THE

23   CURRENT SCHEDULING ORDER WITH REGARD TO INVALIDITY CONTENTIONS

24   AND CLAIM CONSTRUCTION BRIEFING THAT WORK BEING DONE RIGHT NOW

25   ONLY AS TO THE '997.  YOU SHOULD PROCEED ON ALL THE OTHER

1    PATENTS THAT ARE AT ISSUE IN THE CASE, AND I WANT TO TALK ABOUT

2    THAT, BUT WE WILL HAVE A STATUS CONFERENCE IN SEPTEMBER.  THE

3    PARTIES SHOULD JOINTLY NOTIFY THE COURT WHEN YOU GET A DECISION

4    FROM THE PATENT OFFICE, AND I'LL SET A TELEPHONIC, AND IF WE

5    NEED TO HAVE A HEARING BASED ON THE SCOPE OF THE REVIEW IF IT'S

6    GRANTED, THEN WE'LL SET THAT AND MAKE IT REALLY IN SHORT ORDER

7    TO DETERMINE IF THE STAY IS GOING TO GO INTO EFFECT.

8         IF THERE IS GOING TO BE NO EXAMINATION, THEN I'LL GIVE

9    YOU A SCHEDULE AT THAT POINT TO GET THE '997 TEED UP TO JOIN IN

10   THE CLAIM CONSTRUCTION AS QUICKLY AS POSSIBLE BASED ON THE

11   CURRENT SCHEDULE YOU HAVE.  SO IS THAT CLEAR TO EVERYONE?

12        OTHER DISCOVERY, YOU'RE WELCOME TO DO.  THE ONLY THING

13   YOU HAVE DON'T HAVE TO DO RIGHT NOW ARE YOUR INVALIDITY

14   CONTENTIONS, AND YOU DON'T HAVE TO SHARE CLAIM CONSTRUCTION

15   BRIEFING ON THE '997 UNTIL SOME POINT AFTER SEPTEMBER 25TH WHEN

16   WE GET A DECISION FROM THE PATENT OFFICE ON WHAT THEY'RE

17   PLANING TO DO WITH THE '997.  SO THAT TAKES CARE OF THAT MOTION

18   RIGHT NOW IN THE CASE.

19        ALSO IN THIS CASE, AND I KNOW IT'S NOT SCHEDULED TO BE

20   BRIEFED UNTIL JULY, WHICH IS ANNOYING, IS THE MOTION, RELIEF TO

21   AMEND TO ADD THE '696 PATENT.  IT WAS JUST FILED LAST WEEK, AND

22   THE DEFENDANTS OBVIOUSLY HAVEN'T BRIEFED IT YET.  GIVEN THAT

23   YOU RECENTLY ADDED EIGHT OF YOUR OWN PATENTS AND WE ARE AT A

24   POINT IN THE CASE THAT'S VERY EARLY, UNLESS THERE IS SOME PLAN

25   REGARDING AN IPR IN THIS PATENT, I CAN TELL YOU RIGHT NOW, IT'S

1   COMING INTO THE CASE, AND YOU CAN SPARE US ALL A LOT OF TIME,

2   DELAY AND BRIEFING TO OPPOSE ADDING THIS PATENT TO THIS CASE.

3         IT JUST ISSUED.  IT ISSUED WHAT, LAST WEEK?  IT ISSUED

4   ON MAY 21ST.  IT IS THE CONTINUATION OF THE '430 PATENT, WHICH

5   IS STAYED, SO IT'S KIND OF A SWAP.  AND I DON'T SEE ANY REASON

6   UNDER THE LIBERAL RULES OF ALLOWING AMENDMENT TO NOT ALLOW THEM

7   TO AMEND TO ADD THE '696.  I'LL LEAVE IT ON FOR YOU ALL TO

8   BRIEF IT, BUT I'M TELLING YOU NOW, IT'S GOING TO BE A HUGE,

9   UPHILL BATTLE GIVEN THE STATUS.

10        *MR. SCHERKENBACH:*  I HEAR YOU.  I HAVE MY WORK CUT OUT

11  FOR ME.  TWO POINTS, YOUR HONOR, IF I MAY, AND WE'LL FILE A

12  BRIEF AND YOU CAN DECIDE IF WE EVEN NEED A HEARING IF IT HASN'T

13  CHANGED YOUR MIND.  NO. 1, WE WILL ABSOLUTELY BE FILING AN IPR

14  ON THAT PATENT.  THAT PATENT IS ESSENTIALLY THE SAME, IN OUR

15  VIEW, SUBSTANTIVELY AS THE '430 PATENT, WHICH THE PATENT OFFICE

16  HAS KILLED.

17        SO THE CHANCES OF THAT THING SURVIVING IN OUR VIEW ARE

18  EXCEEDINGLY LOW, AND WE'LL EXPLAIN THAT IN OUR PAPERS WHY,

19  OKAY.  SO THAT'S COMING.  AND MAYBE IF YOU LET THE PATENT IN

20  MEANWHILE, EVEN AFTER YOU SEE OUR BRIEFING, WE CAN REVISIT

21  WHETHER TO STAY IT IF AND WHEN IPR IS GRANTED ON THAT PATENT.

22        THE SECOND THING IS, AND I, AGAIN, FEEL COMPELLED TO

23  POUND THE TABLE ON THIS JUST A LITTLE BIT, WHEN WE SET THE

24  SCHEDULE, YOU MENTIONED IT'S EARLY IN THE CASE, AND IN ONE

25  SENSE, IT IS BECAUSE NOT A LOT OF DISCOVERY HAS HAPPENED.  I

1    DON'T DISPUTE THAT.  BUT YOU MAY REMEMBER, AND I'M SURE

2    MAGISTRATE JUDGE DEMBIN WOULD REMEMBER, THAT WHEN WE SET THE

3    SCHEDULE FOR THIS CASE, NUVASIVE WANTED A LONGER SCHEDULE TO

4    ALLOW MORE TIME TO DO THE THINGS THAT HAD TO BE DONE IN THE

5    CASE, OKAY.  IN ROUND NUMBERS, WE WANTED ANOTHER EIGHT MONTHS

6    OR SOMETHING.

7            WARSAW POUNDED THE TABLE ABOUT HOW THAT WAS UNFAIR AND

8    PREJUDICIAL AND THE CASE HAD BEEN PENDING AND WE'VE GOT TO GET

9    THE CASE MOVING AND WE WANT NOW, NOW, NOW, NOW.  THEY GOT THEIR

10   SCHEDULE, AND PART OF THAT WHICH THEY GOT, THEY PREVAILED ON

11   THE COURT AND THEY GOT, WAS A DATE OF MARCH 7TH TO ADD ANY

12   PATENTS BY COUNTERCLAIM THAT WERE GOING TO BE ADDED IN THIS

13   CASE.  THAT WAS IT.  THAT WAS THE CUTOFF, MARCH 7TH.  WE LIVED

14   BY IT.

15           THEY, NOW THAT THEIR '430 GOT TAKEN OUT, WANT TO PUT

16   IN A PLAYER TO BE NAMED LATER, WAY AFTER THE DEADLINE.  AND

17   WITH ALL DUE RESPECT, IT IS COMPLETELY CONTRARY TO EVERYTHING

18   THEY ARGUED FOR IN GETTING THE SCHEDULE.  WE'LL EXPLAIN THAT IN

19   THE PAPERS.  MAYBE IT WON'T CHANGE YOUR MIND, BUT IT STRIKES US

20   AT SOME POINT, CONSISTENCY IS A VALUE THAT OUGHT TO BE

21   RESPECTED HERE.

22           AND THE OTHER THING I WILL SAY IS THAT WE GET PATENTS

23   TOO.  WE GET PATENTS ISSUING ALL THE TIME, EVERY WEEK, AND SO

24   WE'RE SORT OF PLAYING MUSICAL CHAIRS HERE, RIGHT.  THEY GOT

25   ONE, THEY WANT IT IN THE CASE, WE GOT ANOTHER ONE.  SHOULD WE

1   PUT THAT IN THE CASE?  SHOULD WE TRADE IT FOR ONE WE HAVE IN

2   THE CASE IF WE LIKE IT MORE?

3          THE POINT IS, THIS IS ALL PURELY STRATEGIC, RIGHT.

4   THEY'RE ENTITLED TO DO IT IF THEY CAN DO IT.  I'M NOT SAYING

5   THERE'S ANYTHING WRONG WITH IT INHERENTLY, BUT IT'S STRATEGIC.

6   IT'S NOT PREJUDICIAL TO THEM IF IT DOESN'T COME IN.  AND SO AT

7   SOME POINT, THE DECK CHAIRS ARE ARRANGED -- AND IT SEEMS TO ME

8   WE SHOULD STOP, I SHOULD STOP.

9          *THE COURT:*  THIS WASN'T ON THE TABLE, AND I DON'T MEAN

10   TO PAINT YOU IN A CORNER ON THIS BECAUSE OBVIOUSLY THEY JUST

11   FILED THIS REQUEST.  THE ONLY POINT, AND I'LL LET YOU RESPOND,

12   THAT I WOULD CONSIDER MAKING IS THAT BECAUSE THE '430 WAS IN

13   THIS CASE, BECAUSE THE '696 IS A CONTINUATION OF THE '430 AND

14   IT ONLY JUST ISSUED LAST WEEK, SO IT COULDN'T HAVE BEEN BROUGHT

15   IN IN MARCH, I UNDERSTAND YOUR ARGUMENT ABOUT SWAPPING OUT A

16   PLAYER TO BE NAMED LATER, BUT WITHOUT ALL THIS TECHNOLOGY, I'M

17   GOING TO HAVE LEARN IT AND A JURY IS GOING TO HAVE TO LEARN IT,

18   AND TO DO IT MULTIPLE TIMES, THIS CASE HAS ALREADY HAD MULTIPLE

19   TIMES, I WOULD RATHER GET IT IN AND GET IT DONE.

20          I ALSO UNDERSTAND AND I ANTICIPATE YOU WERE GOING TO

21   TELL ME THAT YOU WERE GOING TO CHALLENGE THIS NEWLY-ISSUED

22   PATENT GIVEN THE HISTORY OF THE '430.  AND SO, YOU MAY HAVE

23   FILED YOUR REQUEST FOR THE IPR BEFORE YOUR OPPOSITION IS DUE TO

24   THEIR MOTION TO AMEND, WHICH COULD INFLUENCE MY DECISION.

25          BUT I'LL LEAVE THAT, AND WHY DON'T YOU GO AHEAD.  YOU

1   CAN RESPOND, COUNSEL.

2         MS. WICKRAMASEKERA:  THANK YOU, YOUR HONOR.  YOUR

3   HONOR IS EXACTLY RIGHT, WHAT WE ARE TRYING TO DO HERE IS SWAP

4   THE '696 FOR THE '430.  THEY ARE RELATED.

5         THE COURT:  IT'S THE SAME PATENT.

6         MR. DAUCHOT:  YOUR HONOR HAS MADE THOSE POINTS.  WHAT

7   I WANT TO MAKE CLEAR THOUGH, IS I WANT TO ADDRESS

8   MR. SCHERKENBACH'S TWO POINTS.  I'LL ADDRESS THE LAST ONE

9   REGARDING THE SCHEDULE.  THE MARCH 7TH DATE WAS THE DATE FOR

10  NUVASIVE TO ADD PATENTS.  I DON'T KNOW IF YOUR HONOR RECALLS,

11  YOU ASKED NUVASIVE HOW MANY, THEY SAID, A FEW.

12        THE COURT:  YES, I KNOW.

13        MS. WICKRAMASEKERA:  THEY DIDN'T SAY EIGHT.  AND SO

14  THE SCHEDULE THAT PLAINTIFFS WERE OPERATING ON AT THE TIME WHEN

15  THEY SUBMITTED THE JOINT REPORT REGARDING THE SCHEDULE WAS ALL

16  WE KNEW ABOUT WERE OUR THREE PATENTS.  SO, YOUR HONOR, I WOULD

17  JUST LIKE TO CLARIFY THAT POINT.

18            AND THEN ON THE FIRST POINT REGARDING THEIR IPR

19  REQUEST, NUVASIVE SUBMITTED IN THE '430 REEXAMINATION 45 PAGES

20  OF CLAIM CHARTS DRAWN NOT TO THE PENDING CLAIMS OF THE '430 BUT

21  TO THE ALLOWED CLAIMS OF THE '696.  NOW THE PATENT OFFICE

22  SLAPPED THEM FOR FILING THAT INAPPROPRIATELY, BUT THE PATENTEE,

23  WARSAW, DID TAKE THAT SUBMISSION BECAUSE WE HAD IT AND WE HAD

24  TO PUT IT BEFORE THE PATENT OFFICE BEFORE THE PATENT OFFICE

25  ISSUED THE '696.  THE PATENT OFFICE HAD NUVASIVE'S 45 PAGES OF

1   CLAIM CHARTS DRAWN TO THOSE CLAIMS, THE ALLOWED CLAIMS OF THE

2   '696 PATENT, AND THE PATENT OFFICE REJECTED THEM.  AND THEY

3   DIDN'T JUST REJECT THEM, THEY MADE A STATEMENT ON THE RECORD

4   WHICH IS IN OUR BRIEFING THAT WE SUBMITTED LAST WEEK.

5              THE COURT:  OKAY.

6              MS. WICKRAMASEKERA:  SO I THINK THAT WITH RESPECT TO

7   THE STRENGTH OF ANY IPR REQUEST, I WOULD ASK YOUR HONOR TO

8   CONSIDER THAT.

9              THE COURT:  ALL RIGHT.  THANK YOU.

10             MS. WICKRAMASEKERA:  THANK YOU.

11             THE COURT:  SO THE SCHEDULE IS WHAT IT IS RIGHT NOW ON

12  THE MOTION TO AMEND.  YOU CAN FILE YOUR OPPOSITION, AND ONCE I

13  GET IT, I'LL ENTER A FILE TO SAY WHETHER WE NEED ARGUMENT ON

14  IT.  WE'LL SEE WHAT THE STATUS OF THAT PATENT IS.

15             FOR THE 12CV2738 CASE, AT THIS TIME, IT IS THE COURT'S

16  UNDERSTANDING THAT THE PATENTS THAT WILL BE GOING FORWARD ARE

17  THE '146 AND, AT LEAST TEMPORARILY, THE '997 ON BEHALF OF THE

18  PLAINTIFFS, AND WE MAY OR MAY NOT BE ADDING THE '696 AFTER THAT

19  BRIEFING IS DONE.  LET ME DEAL WITH THOSE FIRST.

20             I'VE LOOKED AT THE NUMBER OF -- WELL, THE '146 AFTER

21  REEXAMINATION NOW HAS FIVE INDEPENDENT CLAIMS.  ACTUALLY TO

22  SIMPLIFY THIS FOR ME, IF YOU WOULD SUBMIT YOUR INFRINGEMENT

23  CONTENTION CHARTS TO THE COURT, AND YOU DON'T HAVE TO FILE

24  THEM, YOU CAN SEND ME COURTESY COPIES, I WOULD LIKE TO LOOK AT

25  THE NUMBER OF CLAIMS THAT YOU'RE ASSERTING.  I'M NOT HEARING

1      EVERY CLAIM IN EVERY PATENT IN THIS CASE.  I'M LIMITING THAT.

2              AND MY APPROACH TO THAT, I THINK, AS A FORMER

3      PRACTITIONER IN THIS AREA, AS A PRACTICAL APPROACH, IS TO START

4      WITH HOW MANY INDEPENDENT CLAIMS DOES A PATENT HAVE, BECAUSE IF

5      YOU CAN'T PROVE INFRINGEMENT OF AN INDEPENDENT CLAIM, I DON'T

6      CARE HOW MANY DEPENDENT CLAIMS YOU WANT TO THROW AT THE COURT.

7      IF YOU HAVE FIVE INDEPENDENT CLAIMS, DO YOU NEED TO ASSERT ALL

8      FIVE OF THEM, OR COULD YOU PICK YOUR TOP THREE, PLEASE, AND

9      THEN, TO THE EXTENT YOU NEED TO ASSERT A DEPENDENT CLAIM TO

10     AVOID SOME INVALIDITY ISSUE, YOU CAN ADD DEPENDENT CLAIMS AS

11     NEEDED.  BUT I'M NOT DOING CLAIM CONSTRUCTION ON 37 CLAIMS

12     TIMES 8 PATENTS.  THAT'S JUST CRAZY.  YOU'RE NEVER GOING TO PUT

13     THAT MANY CLAIMS IN FRONT OF A JURY.

14             OUR LOCAL RULE NOW SAYS YOU'RE LIMITED TO 10 CLAIM

15     TERMS OR PHRASES PER PATENT, AND ABSENT ANY REQUEST THAT YOU

16     ABSOLUTELY NEED TO DO MORE, I THINK THAT THAT'S PLENTY IN THIS

17     CASE, GIVEN THE NUMBER OF PATENTS AT ISSUE.

18             THERE IS NO REQUEST, I GATHER, AT THIS POINT OR NO

19     AGREEMENT TO PHASE THIS CASE WITH REGARD TO THE PATENTS THAT

20     NUVASIVE IS ASSERTING?

21         *MR. SCHERKENBACH:*  NO, YOUR HONOR, THOUGH IT'S

22     CERTAINLY OUR INTENTION TO PARE BACK.  THERE'S NOT GOING TO BE

23     EIGHT PATENTS AT TRIAL.  YOU'RE NOT GOING TO BE DEALING WITH A

24     HUGE NUMBER OF CLAIMS IN CLAIM CONSTRUCTION.

25         *THE COURT:*  OKAY.  WHILE MOST OF THE THOSE HAVE ONE OR

1    TWO INDEPENDENT CLAIMS WITH MANY DEPENDENT CLAIMS ON IT THAT

2    ADD SPECIFICS.  SO ON THE '146, CAN YOU TELL ME NOW, DO YOU

3    KNOW HOW MANY INDEPENDENT CLAIMS YOU'RE ASSERTING?  WERE YOU

4    PLANNING ON DOING ALL FIVE, OR LESS?

5          MS. WICKRAMASEKERA:  YOUR HONOR'S QUESTION IS RELATED

6    TO THE '146 PATENT?

7          THE COURT:  YES.

8          MS. WICKRAMASEKERA:  I'M SORRY, I DON'T HAVE IT IN

9    FRONT OF ME.  I CAN TELL YOU IT'S NOT ALL OF THE CLAIMS,

10   CERTAINLY.  ON THE '146 PATENT, I THINK OUR NUMBER IS CLOSER TO

11   FIVE.

12         THE COURT:  ALL RIGHT.  I WOULD LIKE THEM ALL TO BE

13   CLOSER TO FIVE CLAIMS TOTAL FOR EACH PATENT, UNLESS THERE IS A

14   NECESSITY TO GO BEYOND THAT.  AND OBVIOUSLY YOU WANT TO START

15   WITH YOUR INDEPENDENT CLAIMS AND THEN DETERMINE WHICH DEPENDENT

16   CLAIMS.

17         NOW UNDERSTAND THAT IN LIMITING THIS TO SAY I WOULD

18   LIKE YOU TO DO FIVE CLAIMS PER PATENT, IT IS WITHOUT PREJUDICE

19   TO A PARTY LATER COMING BACK SAYING, EITHER IN LIGHT OF CLAIM

20   CONSTRUCTION OR PRIOR ART THAT IS PROVIDED DOWNSTREAM OR SOME

21   OTHER LEGITIMATE DISCOVERY ISSUE, YOU WANT TO ADD A CLAIM, YOU

22   CAN MAKE A SHOWING TO THE COURT THAT IT IS NECESSARY NOW TO ADD

23   A DEPENDENT CLAIM YOU PREVIOUSLY HADN'T ASSERTED BECAUSE

24   SOMETHING HAS COME UP THAT YOU NOW HAVE TO STRETCH FARTHER TO

25   PROVE YOUR INFRINGEMENT IN LIGHT OF THE INVALIDITY CHALLENGE.

1      BUT I DON'T WANT THIS TO BECOME, AND SINCE IT'S GOING

2   BOTH DIRECTIONS IN THIS CASE AND SO I THINK THERE'S LESS

3   INCENTIVE TO DO IT, TO BE SOME HUGE HOMEWORK ASSIGNMENT WHERE

4   EVERYONE HAS TO ADDRESS 50 CLAIMS ON EACH SIDE ON EACH PATENT

5   BECAUSE THAT'S A WASTE OF EVERYONE'S TIME, AND HAVING TO DO

6   HUGE INVALIDITY CHARTS FOR EVERY DEPENDENT CLAIM JUST GETS

7   NUTS.  SO I THINK FIVE WOULD BE AN APPROPRIATE LIMIT ON THE

8   '146.

9      I THINK THAT AND CAN I CAN SEE ON THE '997 BECAUSE IN

10   THE BRIEFING YOU INDICATED YOU WERE GOING WITH THREE OF THE

11   METHOD CLAIMS, 1, 17 AND 24.  SO FOR EACH OF THOSE, NOT MORE

12   THAN TWO DEPENDENT CLAIMS YOU SHOULD PROCEED WITH.  SO IF YOU

13   GO WITH 1, 17, AND 24, YOU CAN DO A TOTAL OF NINE CLAIMS IN

14   THAT CASE, IF NEEDED.  THEY'RE ALL METHOD CLAIMS.  IF YOU DON'T

15   NEED TO DO METHOD CLAIMS, LET'S CONSIDER PARING BACK ON THAT.

16      NOW ON THE DEFENDANT'S PATENTS.  THE '782 HAS TWO

17   INDEPENDENT CLAIMS.  THE '535 HAS ONE, THE '767 HAS ONE.  THE

18   '356 HAS TWO.  THE '334 HAS ONE AND THE '156 HAS ONE.  SO FOR

19   EACH OF THOSE, I DON'T SEE ANY REASON WHY YOU NEED TO ASSERT

20   MORE THAN FIVE TOTAL CLAIMS.  I WOULD LIKE YOU TO SEE YOU DO

21   LESS IF YOU CAN IN TERMS OF THE DEPENDENT CLAIMS YOU DO BEYOND

22   THE INDEPENDENT CLAIMS.

23      BUT I'M GOING TO LIMIT EACH OF THOSE PATENTS TO FIVE

24   CLAIMS IN THE FIRST INSTANCE TO PROCEED FOR CLAIM CONSTRUCTION,

25   AND AGAIN, WITHOUT PREJUDICE IF YOU HAVE TO BRING SOMETHING IN

1   LATER.  SO THAT'S MY GUIDANCE FOR YOU GOING FORWARD FOR YOUR

2   CLAIM CONSTRUCTION.

3          AND AS TO EACH PATENT, YOU ARE LIMITED TO TEN TERMS OR

4   PHRASES WITHIN THE PATENT REGARDLESS WHETHER YOU'RE ASSERTING

5   ONE CLAIM OR FIVE CLAIMS, UNLESS YOU NEED TO DO MORE.  IF YOU

6   NEED TO DO MORE, YOU NEED TO LET THE COURT KNOW.  WE'LL SET UP

7   A STATUS CONFERENCE AND DISCUSS IT, BUT, HOPEFULLY, YOU WILL BE

8   ABLE TO FOCUS IN ON THINGS THAT WILL BE CRITICAL TO

9   INFRINGEMENT AND VALIDITY, NOT JUST AN ACADEMIC EXERCISE ON

10  CLAIM CONSTRUCTION.  THAT WOULD BE A WASTE OF TIME.

11          THOSE WERE MY ISSUES TODAY FOR THE 012 CASE.  I WOULD

12  LIKE TO TAKE ONE MORE STEP BACKWARDS TO THE 08 CASE FOR A

13  LITTLE BIT OF HOUSEKEEPING THERE TO MAKE SURE WE'RE ALL ON THE

14  SAME PAGE.  SO WITH THE SETTLEMENT AND THE DISMISSALS THAT WERE

15  FILED IN THAT CASE, THE COURT UNDERSTANDS THAT LEFT AS PATENTS

16  IN THIS CASE ARE THREE PATENTS NOW ON APPEAL, THE TWO WARSAW

17  PATENTS, THE '973 AND THE '933 AND THE NUVASIVE '236 PATENTS.

18  THE OTHER PATENT FROM THE TRIAL HAS BEEN SETTLED AND DISMISSED

19  FROM THE CASE.

20          AND THERE WAS A LITTLE INKLING, PERHAPS BACK IN

21  FEBRUARY, THAT YOU WERE TALKING ABOUT A STIPULATED ONGOING

22  ROYALTY, BUT THAT CLEARLY HASN'T HAPPENED, SO PRIORITY ONE FOR

23  ME IS TO GET THAT DONE NOW AS TO THESE THREE PATENTS SO THAT

24  THE APPEAL CAN GO FORWARD.

25          THE '320, WHICH WAS THE PHASE II PATENT THAT WAS TEED

1    UP, HAS SETTLED.  SO THERE IS AN OPEN ISSUE ON THE DOCKET

2    REGARDING A MOTION TO AMEND.  THE COURT IS JUST GOING TO TAKE

3    THAT OFF AS DEEMED WITHDRAWN IN LIGHT OF THE SETTLEMENT.

4         THE '661 I UNDERSTAND IS ABANDONED IN REEXAM.  IT'S

5    STILL HANGING OUT THERE ON THE DOCKET.  AS FAR AS I CAN TELL,

6    NOTHING WAS EVER FILED WITH THE COURT TO CLOSE OUT THAT CLAIM,

7    SO A JOINT MOTION ON BEHALF OF THE PARTIES TO SAY THAT THE '661

8    IS NO LONGER AN ISSUE IN THE CASE AND CAN BE DISMISSED WITH

9    PREJUDICE, THAT'S ALL I NEED, JUST SO WE CAN CLOSE THAT OUT.

10   BECAUSE WHAT I WOULD LIKE TO DO IS CLOSE THIS CASE COMPLETELY

11   ON THE APPEAL SO THE ONLY THING I HAVE LEFT IS THE '949 AND THE

12   '058 WHICH ARE LISTED STILL AS STAYED IN THE 08 CASE.  WHAT'S

13   UP WITH THOSE PATENTS?

14        MR. SCHERKENBACH:  STILL IN PATENT OFFICE PROCEEDINGS.

15   ACTUALLY OUR PLAN WITH THOSE WAS JUST TO DISMISS THEM WITHOUT

16   PREJUDICE, GET THEM OUT OF THE CASE.

17        THE COURT:  FINE.  IF THAT'S YOUR DECISION, THEN I

18   THINK MAYBE WE ROLL THAT INTO A JOINT MOTION WITH THE '661.

19        MR. SCHERKENBACH:  SURE.

20        THE COURT:  TO SAY WITH REGARD TO THESE PATENTS THAT

21   WERE ASSERTED IN THE 08 CASE, THE PARTIES ARE DISMISSING, YOURS

22   ARE WITHOUT PREJUDICE, THAT THE '661, WITH OR WITHOUT, I DON'T

23   KNOW, IF THIS IS ABANDONED AND IT'S BEEN --

24        MR. DAUCHOT:  WE'LL DEAL WITH THAT.

25        THE COURT:  DEAL WITH THAT.  THAT WAY THAT CASE WHEN I

1   FINISH THE LAST ORDER AND IT GOES UP, IT WILL BE A CLOSED CASE

2   AT THE DISTRICT COURT LEVEL, AND WE'LL JUST COME BACK ON REMAND

3   ON WHATEVER ISSUES WE NEED TO COME BACK.  SO THAT WILL BE GOOD,

4   THAT WILL CLEAN UP THE DOCKET ON THAT CASE.  OKAY.  ANY

5   QUESTIONS?

6           *MR. SCHERKENBACH:*  NO, YOUR HONOR, NOT FROM NUVASIVE.

7           *MR. DAUCHOT:*  NOT HERE, YOUR HONOR.

8           *THE COURT:*  WHAT I'D LIKE TO DO IN SEPTEMBER, AND

9   OBVIOUSLY IF ANYTHING COMES UP WITH SCHEDULING IN THE INTERIM,

10  I'M TRYING AND ALL THE JUDGES IN THE PATENT PILOT PROGRAM ARE

11  TRYING TO TAKE A MORE ACTIVE ROLE IN SCHEDULING AND NOT JUST

12  LETTING THE MAGISTRATE JUDGES DO IT BECAUSE WE NOW HAVE SO MANY

13  PATENT CASES, IT'S BECOMING A BIT OF A CONTROL ISSUE.  WHEN WE

14  GET A DECISION IN SEPTEMBER AND DEPENDING HOW THAT TURNS OUT

15  AND GOING FORWARD IN SCHEDULING, I THINK I WOULD LIKE TO DO A

16  JOINT CASE MANAGEMENT CONFERENCE WITH JUDGE DEMBIN HERE SO THAT

17  I CAN BE A LITTLE MORE INVOLVED IN THE SCHEDULING GOING FORWARD

18  AND MAKE SURE WE'RE STILL ON A SCHEDULE THAT'S WORKING FOR

19  EVERYONE.

20          WE'RE GOING TO HAVE TO DISCUSS AT THAT POINT THE

21  TIMING WITH REGARD TO THE CLAIM CONSTRUCTION HEARING.  I'VE GOT

22  YOU ON CALENDAR FOR THE DATE THAT'S SCHEDULED, THE NOVEMBER

23  DATE.  BUT GIVEN THE NUMBER OF PATENTS, WE'LL HAVE TO TALK

24  ABOUT HOW MANY PATENTS WE CAN REASONABLY DO EACH DAY AND HOW

25  MANY ADDITIONAL DAYS OR TWO DAYS, WHATEVER IT'S GOING TO NEED

1   AND GET THOSE SCHEDULED AS WELL.  BUT I THINK WE'LL DO ALL THAT

2   IN SEPTEMBER AFTER WE GET THE PTO DECISION AND KNOW WHERE WE

3   ARE IN THE '997.  ALL RIGHT.  THANK YOU.

4       *(COURT IN RECESS AT 11:01 A.M.)*

5   ***  END OF REQUESTED TRANSCRIPT ***

6                              -OOO-

7                C E R T I F I C A T I O N

8          I HEREBY CERTIFY THAT I AM A DULY APPOINTED, QUALIFIED

9   AND ACTING OFFICIAL COURT REPORTER FOR THE UNITED STATES

10  DISTRICT COURT; THAT THE FOREGOING IS A TRUE AND CORRECT

11  TRANSCRIPT OF THE PROCEEDINGS HAD IN THE AFOREMENTIONED CAUSE

12  ON MAY 30, 2013; THAT SAID TRANSCRIPT IS A TRUE AND CORRECT

13  TRANSCRIPTION OF MY STENOGRAPHIC NOTES; AND THAT THE FORMAT

14  USED HEREIN COMPLIES WITH THE RULES AND REQUIREMENTS OF THE

15  UNITED STATES JUDICIAL CONFERENCE.

16

17  DATE:  MAY 31, 2013, AT SAN DIEGO, CALIFORNIA.

18                          S/MAURALEE A. RAMIREZ

19                          MAURALEE A. RAMIREZ
                            OFFICIAL COURT REPORTER
20                          RPR, CSR NO. 11674

21

22

23

24

25